IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WORCESTER DIVISION

_____
                                        )
JOSILYN GOODALL,                        )
    individually and as next friend of     )
    A.S., a minor child,                   )
                      *Plaintiffs*,   )    **Case No. CV18-40199**
                                        )
    v.                                  )    **COMPLAINT**
                                        )    **Jury Trial Demanded**
WORCESTER SCHOOL COMMITTEE;             )
                                        )
MAUREEN BINIENDA,                       )
    in her official capacity as Superintendent of  )
    Worcester Public Schools;              )
                                        )
LINDA SPEARS,                           )
    In her official capacity as            )
    Commissioner of the Massachusetts      )
    Department of Children & Families;     )
                                        )
SUZANNE CARDONA,                        )
    In her individual capacity;            )
                                        )
ADRIEANNA COONAN,                       )
    In her individual capacity; and        )
                                        )
JANE DOE,                               )
    In her individual capacity,            )
                                        )
                      *Defendants*.  )
_____ )

## I.      PRELIMINARY STATEMENT

Plaintiff JOSILYN GOODALL, individually and as next friend of her minor child, A.S.,

seeks compensatory damages under 42 U.S.C. § 1983 against Defendants WORCESTER

SCHOOL COMMITTEE, a municipal body of the City of Worcester, Massachusetts, for an

unconstitutional policy that interfered with Josilyn's fundamental right under the Fourteenth Amendment's Due Process Clause to direct the education of A.S.

The Plaintiffs also seek compensatory damages under 42 U.S.C. § 1983 against Defendant JANE DOE for setting in motion a series of events that she knew or should have known would interfere with Josilyn's fundamental right under the Fourteenth Amendment's Due Process Clause to direct the education of A.S.; compensatory damages under 42 U.S.C. § 1983 against Defendants SUZANNE CARDONA and ADRIEANNA COONAN for setting in motion a series of events that they knew or should have known would interfere with Josilyn's fundamental right under the Fourteenth Amendment's Due Process Clause to direct the education of A.S. by enrolling him in a homeschool program; and compensatory damages under 42 U.S.C. § 1983 against Defendants SUZANNE CARDONA and ADRIEANNA COONAN for setting in motion a series of events that they knew or should have known would lead officers of the Worcester Police Department to unreasonably seize and interrogate A.S. on March 31, 2018, in violation of the Fourth Amendment.

The Plaintiffs also seek a declaration and judgment pursuant to G.L. ch. 231A, § 1, *et. seq.*, against the WORCESTER SCHOOL COMMITTEE and Superintendent MAUREEN BINIENDA that the School Committee's homeschool policy, which requires parents to continue to send their children to public school while their homeschool plan is awaiting approval, violates the Due Process Clause of the Fourteenth Amendment and is contrary to Massachusetts law and the Supreme Judicial Court's decision in *Care & Protection of Charles*, 399 Mass. 324 (1987). The Plaintiffs also seek a declaration and judgment against the WORCESTER SCHOOL COMMITTEE and Superintendent MAUREEN BINIENDA that the School Committee's policy of reporting families for child abuse and neglect investigations to the Department of Children

and Families, when the family's homeschool plan is awaiting approval, violates the Due Process Clause of the Fourteenth Amendment and is contrary to *Charles*.

The Plaintiffs also seek a declaration and judgment against Defendant COMMISSIONER LINDA SPEARS, pursuant to G.L. ch. 231A, § 1, *et. seq.*, that when the Massachusetts Department of Children and Families receives a report of educational neglect, and the Department discovers during its investigation that the report was made because the parents and school officials disagree on whether a homeschool plan should be approved, the Department should discontinue the investigation and refer the matter back to the School Committee or Superintendent for resolution under *Charles*, and should not make a finding of educational neglect.

Finally, the plaintiffs seek costs and attorneys' fees pursuant to 42 U.S.C. § 1988, any other and further relief that the Court deems proper, and a trial by jury when the issues are joined. In support of the causes of action presented herein, Plaintiffs state as follows:

## PARTIES

1.      Plaintiff Josilyn Goodall is a citizen of the United States of America, who resides in the County of Worcester, Massachusetts. Josilyn is the biological mother of Plaintiff A.S.

2.      Defendant City of Worcester School Committee, with a principal address of 20 Irving Street, Worcester, Massachusetts 01609, is a municipal public body of the city of Worcester. Pursuant to G.L. c. 43, § 33, the School Committee is authorized to make all reasonable rules and regulations, consistent with law, for the management of the public schools of the city of Worcester.

3.      Defendant Maureen Binienda is the Superintendent of Worcester Public Schools. Superintendent Binienda is authorized by G.L. ch. 76 § 1 and the policies of the Worcester

School Committee to review and approve homeschool instruction plans filed by parents in the City of Worcester. In addition, Superintendent Binienda exercises authority and oversight over employees of the Superintendent's Office, as well as the principals, administrators, and staff of the public schools in the City of Worcester, including Woodland Academy. Superintendent Binienda is sued in her official capacity only.

4.      Defendant Linda Spears is the Commissioner of the Massachusetts Department of Children & Families ("the Department"). The Department, which has a principal address of 600 Washington Street, 6th Floor, Boston, MA 02111, is an agency of the Commonwealth of Massachusetts. The Department maintains an Area Office in Worcester County, located at 13 Sudbury Street, Worcester, Massachusetts 01609. Commissioner Spears is authorized pursuant to state law, G.L. c. 18B, § 7, to adopt rules and regulations for the Department necessary to carry out its obligations and duties under G.L. c. 18B and c. 119. At all times at issue in this Complaint, Commissioner Spears was acting in her capacity and within the scope of her office as Commissioner of the Department. Commissioner Spears is sued in her official capacity only.

5.      Defendant Suzanne Cardona is a DCF Supervisor employed by the Massachusetts Department of Children and Families, and is assigned to the Department's Worcester County Area Office, located at 13 Sudbury Street, Worcester, Massachusetts 01609. At all times at issue in this Complaint, Supervisor Cardona was acting in her capacity and within the scope of her employment as a DCF Supervisor for the Department. Supervisor Cardona is sued in her individual capacity.

6.      Defendant Adrieanna Coonan is a DCF Investigator employed by the Massachusetts Department of Children and Families, and is assigned to the Department's Worcester County Area Office, located at 13 Sudbury Street, Worcester, Massachusetts 01609.

At all times at issue in this Complaint, Investigator Coonan was acting in her capacity and within the scope of her employment as a DCF Investigator for the Department. Investigator Coonan is sued in her individual capacity.

7.    Defendant Jane Doe is an unknown employee of Woodland Academy, a public school in the Worcester School District, located at 93 Woodland Street, Worcester, Massachusetts 01610. Ms. Doe is sued in her individual capacity.

## JURISDICTION AND VENUE

8.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201, *et. seq.* The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9.    Additionally, the Plaintiffs bring two claims against Worcester Public Schools and the Department of Children and Families pursuant to the Massachusetts Declaratory Judgment Act, G.L. ch. 231A, § 1, *et. seq.* This Court has jurisdiction over these claims under 28 U.S.C. § 1367, in that they are related to and arise out of the same case or controversy as the federal constitutional claims over which this Court has original jurisdiction.

10.    Venue is proper pursuant to 28 U.S.C. § 1391, in that at all times pertinent to this action all the defendants were residents of the Commonwealth of Massachusetts; defendant Worcester School Committee maintains its principal office in the County of Worcester, Massachusetts; defendant Massachusetts Department of Children & Families maintains an area office in the County of Worcester, Massachusetts; Defendant Adrieanna Coonan resides in the County of Worcester; the Plaintiffs reside in the County of Worcester, Massachusetts; and a substantial part of the events or omissions giving rise to the claims presented herein occurred in the County of Worcester, Massachusetts.

## ALLEGATIONS OF FACT

*A.*      *Home Education in the Commonwealth of Massachusetts.*

11.      The right of parents to direct the education of their children is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment.

12.      At the core of this right stands the freedom of a parent to choose to enroll her child in any lawful form of instruction, whether public, private, or home-based education.

13.      Similarly, the General Court of Massachusetts recognizes by statute the right of a parent to choose between lawful alternative forms of education by enrolling her child in a public day school, another day school approved by the school committee, or by seeing that a child is "otherwise instructed in a manner approved in advance by the superintendent or the school committee." G.L. ch. 76, § 1.

14.      In *Care & Protection of Charles*, the Supreme Judicial Court of Massachusetts held that a parent may choose to submit a proposal to homeschool her child pursuant to G.L. ch. 76, § 1. *Care & Protection of Charles*, 399 Mass. 324, 331 (1987).

15.      *Charles* further held that "the liberty interests protected by the Fourteenth Amendment extend to activities involving child rearing and education." 399 Mass. 324, 334 (1987).

16.      *Charles* further held that G.L. ch. 76, § 1 did not inhibit the exercise of constitutionally protected rights because it permitted a parent to choose home education as a lawful alternative form of education for her children.

17.      *Charles* further held that while the Commonwealth has an interest in ensuring that children are educated, that interest is limited to ensuring that the children residing within the State receive an education, not that the educational process be dictated in its minutest detail.

18.     Although *Charles* recognized that "approval" of a homeschool program under G.L. ch. 76, § 1 did not automatically infringe on the right of parents to direct the education of their children, the Supreme Judicial Court cautioned that Committees are bound by a substantial body of statutory law when exercising their approval power.

19.     *Charles* cautioned school committees that "the approval of a home school proposal must not be conditioned on requirements that are not essential to the State interest in ensuring that 'all the children shall be educated.'"

20.     *Charles* also recognized that there may be situations where the parents and the School Committee disagree on whether a homeschool program should be approved. To resolve these differences, and to respect the constitutional rights of parents, *Charles* provides guidelines and procedural requirements for handling disputes between parents and School Committees over the approval of a homeschool program.

21.     At a minimum, the School Committee must provide the parent with an opportunity to explain her proposed homeschool plan and to present witnesses on her behalf.

22.     If, after this opportunity for a hearing, the School Committee rejects the homeschool plan, the Committee or Superintendent must detail the reasons for the decision and give the parent an opportunity to revise the proposal to remedy its inadequacies.

23.     *Charles* also recognized that while G.L. ch. 76, § 1 states that "approval must be obtained in advance," an inflexible requirement of prior approval is likely to violate the constitutional rights of parents in situations where the parents and the School Committee are working through the process of approving of the homeschool program.

24.     To avoid an unconstitutional outcome, *Charles* held that "if the parents commence the education of their children at home in the face of the school committee's refusal

to approve the parents' home school proposal, the burden of proof under G. L. c. 119 or G. L. c. 76, § 2, shifts to the school committee to show that the instruction outlined in the home school proposal fails to equal 'in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town . . . .'" *Charles*, 399 Mass. at 338.

**B.      *The Worcester School Committee's Homeschool Policy.***

25.      The Worcester School Committee is authorized by law to adopt rules and regulations, consistent with law, for the management of the public schools of the city of Worcester. G.L. c. 43, § 33.

26.      The Worcester School Committee has adopted an official written policy for homeschooling in the City of Worcester.

27.      Pursuant to G.L. c. 43, § 33, the School Committee's official written policy for homeschooling must be consistent with the law of the Commonwealth of Massachusetts.

28.      The School Committee's official written homeschool policy is not consistent with the law of the Commonwealth of Massachusetts.

29.      The School Committee's written policy states that "Parents/guardians who choose to educate their children at home, as allowed under Massachusetts law, can fulfill the requirements of the compulsory attendance statute by having their educational programs reviewed and accepted in advance by the Worcester Public Schools. Students must attend their assigned school until approval has been received."

30.      On information and belief, the School Committee's homeschool policy was adopted and in force in the City of Worcester during the 2017-2018 school year.

31.      The School Committee has also adopted a written policy with regards to non-attendance at school.

32.     Pursuant to G.L. c. 43, § 33, the School Committee's official written policy for non-attendance must be consistent with the law of the Commonwealth of Massachusetts.

33.     The School Committee's official written non-attendance policy is not consistent with the law of the Commonwealth of Massachusetts.

34.     The School Committee's attendance policy states that "Parents and guardians are notified by phone on a daily basis if their child is absent. After five unexcused absences, the principal (or his/her designee) will notify the parent(s) or guardian(s) in writing and, when appropriate, request a meeting to discuss the student's attendance. Parents will continue to receive written notification of their child's attendance at every 5th absence from school. Parents and guardians will also receive attendance information through: 1. Interim and attendance progress reports (at five weeks into each marking period) 2. Report cards (every ten weeks). The secondary report cards show students' absences from each class and students' total absences from school."

35.     The School Committee's attendance policy further states that "[w]hen a student accumulates excessive unexcused absences, the principal (or his/ her designee) may seek assistance from the Juvenile Court and/or the Department of Children and Families to resolve attendance matters."

36.     On information and belief, the School Committee's attendance policy was adopted and in force in the City of Worcester during the 2017-2018 school year.

37.     The School Committee has adopted written policies on homeschooling and school attendance which are customarily applied by the Office of the Superintendent of Worcester Public Schools.

38.     On information and belief, pursuant to the School Committee's homeschool policy, a parent who has withdrawn her child from a public school in Worcester and submitted a homeschool plan for approval must continue to cause her child to attend that public school until the homeschool plan is approved.

39.     On information and belief, pursuant to the School Committee's homeschool and attendance policies, a child who has been withdrawn from public school to be homeschooled by her parent is marked "absent" by the public school until such time as the public school receives notice from the School Committee or Superintendent's Office that the child's homeschool program has been approved.

40.     On information and belief, pursuant to the School Committee's attendance policy, when a child who has been withdrawn from public school to be homeschooled but is marked "absent" from the public school accumulates excessive unexcused absences, the public schools in Worcester file a report of educational neglect with the Department of Children and Families.

**C.      *Josilyn's Homeschool Program***

41.     In early January 2018, Josilyn Goodall decided to homeschool her son, A.S., who was then enrolled in Woodland Academy, a public school in the City of Worcester.

42.     On January 11, 2018, Goodall submitted a homeschool educational plan to Defendant Maureen Binienda, Superintendent of Worcester Public Schools, via electronic mail to BiniendaM@worc.k12.ma.us, for approval by the Superintendent or School Committee under G.L. ch. 76, § 1.

43.     On information and belief, from January 2018 through May 2018, Superintendent Binienda's e-mail address was listed on the Worcester Public School's website as BiniendaM@worc.k12.ma.us.

44.    In her instructional plan that she e-mailed to Superintendent Binienda, Josilyn stated that she would be homeschooling him for the remainder of the school year, and that she would provide instruction in reading, writing, geography, mathematics, arithmetic, history, science, technology, music, art, health, physical education, and religion.

45.    Josilyn's instructional plan further offered to provide an annual progress report or dated work samples to the Superintendent's office upon request.

46.    Josilyn's instructional plan concluded with the following statement: "Please commence authorization as expeditiously as possible and should there be any reason for disproval [sic], please redirect me as to what needs to be fixed in this education plan as required by law."

47.    On January 11, 2018, Josilyn also signed, dated, and filed a letter of withdrawal withdrawing A.S. from Woodland Academy and stating that she was submitting a notice of intent to homeschool pursuant to G.L. ch. 76, § 1.

48.    Josilyn then began providing at-home instruction to A.S. of approximately thirty-hours per week, in accordance with the terms of the instructional plan that had been submitted to Superintendent Binienda for approval.

49.    On or around January 16, 2018, Josilyn received a letter from Woodland Academy stating that A.S. was being marked "absent" from school.

50.    On January 16, 2018, Josilyn e-mailed Ms. Patricia Padilla, the Principal of Woodland Academy, at padillap@worc.k12.ma.us.

51.    On information and belief, from January 2018 through May 2018, Principal Padilla's e-mail address was listed on the Worcester Public School's website as padillap@worc.k12.ma.us.

52.    In her e-mail, Josilyn informed Principal Padilla that Josilyn had filed her instructional plan with the Superintendent's office and was awaiting approval. Josilyn provided a courtesy copy of the instructional plan that had been sent to Superintendent Benienda to Principal Padilla.

53.    On January 23, 2018, Josilyn contacted Superintendent Binienda by electronic mail, asking for an update on the status of her instructional plan and whether it had been approved by the school committee.

54.    In this message, Josilyn informed Superintendent Binienda that she had been informed that Woodland Academy was marking A.S. "absent" as if he were still enrolled there.

55.    In this message, Josilyn again asked Superintendent Binienda to let her know if any part of her instructional plan needed to be revised.

56.    In this message, Josilyn informed Superintendent Binienda that she had attempted to contact the Superintendent's office to discuss the status of her instructional plan, but was referred to a different department. Josilyn provided Superintendent Binienda with her phone number.

57.    Josilyn did not receive any message in reply from Superintendent Binienda.

58.    In the interim, Josilyn continued to provide weekly at-home instruction to A.S.

59.    On March 9, 2018, Josilyn again contacted Superintendent Binienda by letter, asking for an update on the status of her instructional plan and whether it had been approved by the school committee.

60.    In her letter, Josilyn noted that her instructional plan had been submitted for approval sixty (60) days before, but that she had not received any response.

61.     In her letter, Josilyn requested to meet with Superintendent Binienda in person to discuss the status of her instructional plan.

62.     Josilyn did not receive any message in reply from Superintendent Binienda.

63.     As she waited for a response, Josilyn continued to provide weekly at-home instruction to A.S.

**D.     *Worcester Public Schools reports Josilyn to the Department of Children and Families.***

64.     On March 20, 2018, Josilyn returned to her home to find a business card on her door.

65.     The business card listed the name and contact information of Adrieanna Coonan, a DCF Investigator employed by the Massachusetts Department of Children and Families.

66.     On March 21, 2018, Josilyn contacted Investigator Coonan by e-mail, and requested that Investigator Coonan disclose the allegations made against her.

67.     That same afternoon, Investigator Coonan replied to Josilyn via e-mail. Investigator Coonan disclosed that a mandated reporter had alleged that A.S. was not attending school and had accumulated 48 absences. Investigator Coonan asked if she could arrange a time to meet with Josilyn and A.S. the following day (March 22, 2018), or Wednesday of the following week (March 28, 2018).

68.     Neither Josilyn nor Investigator Coonan communicated with each other until the following week.

69.     On or around March 23, 2018, Josilyn received written notice from the Juvenile Court that Worcester Public Schools had filed an ADF complaint on March 21, 2018, alleging that she had failed to send her child to school as of March 12, 2018.

70.     On March 28, 2018, at approximately 9:30 a.m., Investigator Coonan sent a follow-up e-mail to Josilyn, asking if she would be available to meet.

71.     On March 29, 2018, at approximately 10:30 a.m., Investigator Coonan sent an e-mail to Josilyn asking to set-up a time to meet with her.

72.     When Josilyn returned to her home on the afternoon of March 29, 2018, she found a certified letter from Investigator Coonan informing Josilyn that Investigator Coonan was planning to return to Josilyn's house the following week, on April 3, 2018, at 11:00 a.m. Investigator Coonan's letter further stated that "if we are unable to observe your child we will have to have a legal consultation."

73.     That evening, Josilyn wrote an e-mail to Investigator Coonan which informed Investigator Coonan that Josilyn had submitted an educational plan to the Superintendent's Office and withdrawn A.S. from Woodland in January 2018.

74.     Josilyn further informed Investigator Coonan that parents in Massachusetts are not required by law to continue to send their children to school after a homeschool instructional plan has been submitted for approval.

75.     Josilyn further informed Investigator Coonan that the Superintendent's Office had not provided any further information regarding the status of her instructional plan, had not asked her to correct any deficiencies in the instructional plan, and had not asked her to provide any additional information.

76.     On the morning of March 30, 2018, Josilyn and A.S. left their home to run some errands.

77.     When Josilyn and A.S. returned to their home, they were told by Josilyn's father, Brian Gernrich, that some uniformed officers had come by the house earlier that morning.

- 14 -

78.     Brian had told the officers that Josilyn was homeschooling A.S.

79.     While the officers were speaking with Brian, one of the officers contacted someone by phone while they were at Josilyn's home.

80.     On information and belief, the person the officers contacted by phone Defendant Suzanne Cardona, who was the DCF Supervisor of Investigator Coonan.

81.     Brian told the officers that Josilyn and A.S. were expected to return to the home within the hour.

82.     Upon learning this, the officers left Josilyn's home.

83.     After Josilyn returned home, she placed a copy of her instructional plan, as well as her e-mails to Superintendent Binienda, in a blue folder and left it outside her door for Investigator Coonan.

84.     At approximately 11:30 a.m. on March 30, 2018, Josilyn heard loud banging coming from her doorway.

85.     Josilyn asked who was there.

86.     A male voice from the other side of the door said, "Police."

87.     A female voice from the other side of the door said that they were not going to enter the house, and that they just wanted to confirm that A.S. was living and breathing.

88.     Josilyn told the police that A.S. was with her in the home.

89.     Josilyn told the police that she was uncomfortable bringing A.S. to the police because he had had a traumatic experience with officers several years before, but that she was willing to take A.S. to his physician to verify his health.

90.     Josilyn told the police that she had been in contact with the Department and that she had put a folder outside the door which contained her homeschool paperwork.

91.   On information and belief, the officers saw the blue folder containing Josilyn's homeschool paperwork when they arrived at her door.

92.   On information and belief, one of the officers looked inside the blue folder upon arriving at Josilyn's door.

93.   Josilyn told the police that she had submitted her homeschool paperwork to the Superintendent's office in accordance with Massachusetts law.

94.   Josilyn heard more loud bangs on her door.

95.   Josilyn asked if the police were trying to open her door and told them that she did not consent to their entry.

96.   A female voice from the other side of the door said that she wanted Josilyn to open the door.

97.   Josilyn responded that she was not going to open the door because she was afraid it would upset A.S.

98.   Josilyn told the officers that A.S. was with her inside the home.

99.   Josilyn offered to take a picture of A.S. to verify that he was alright and to show it to the officers.

100.   A male voice from the other side of the door said that they were going to force open the door.

101.   Josilyn asked the officers if they could please provide their names.

102.   A female voice said that her name was Officer Consiglio and that Josilyn had three seconds.

103.   Officer Consiglio told Josilyn that if she did not open the door, they would call a S.W.A.T. team to forcibly open the door.

104.    While the police were yelling at Josilyn through the closed door, Josilyn saw that A.S. was becoming visibly upset.

105.    Josilyn believed that if she did not open the door, the police would forcibly open it and enter her home.

106.    Josilyn believed that if the officers forced their way into her home, it would be traumatizing to A.S.

107.    Because Josilyn did not want A.S. to endure any unnecessary trauma, she unlocked and opened the door to her home.

108.    Upon opening the door, Josilyn asked for the other officer's name.

109.    When Josilyn opened the door, Officer Consiglio crossed the threshold and laid hands on Josilyn.

110.    Another uniformed officer and Investigator Coonan then entered Josilyn's home, following Officer Consiglio.

111.    Both officers were in uniform and were armed with service weapons.

112.    On information and belief, the officers entered Josilyn's home in possession of an outstanding bench warrant that they discovered after they left Josilyn's home that morning and before they returned to her residence. The outstanding bench warrant was for a partially unpaid fine.

113.    Officer Consiglio instructed Josilyn to put her hands behind her back.

114.    Josilyn asked Officer Consiglio, "What are you doing?"

115.    Officer Consiglio handcuffed Josilyn.

116.    Josilyn asked Officer Consiglio, "What are the charges?"

117.    Officer Consiglio ordered Josilyn in a loud, raised voice to sit down on a chair in the middle of her kitchen.

118.    Josilyn sat on the chair as Officer Consiglio ordered her to do.

119.    Officer Consiglio put her face in front of Josilyn's and ordered her in a loud, raised voice to be quiet.

120.    Officer Consiglio told Josilyn, in a loud, raised voice, that they were there to check on the welfare of A.S., and that Josilyn was not cooperating with the police.

121.    Officer Consiglio told Josilyn, in a loud, raised voice, that she had "zero tolerance" for Josilyn.

122.    Josilyn told Officer Consiglio that she had left a folder in front of her door containing her homeschool paperwork.

123.    Officer Consiglio told Josilyn, in a loud, raised voice, that the Department was with them and that Josilyn was going to answer their questions.

124.    Josilyn told Officer Consiglio, "okay."

125.    Investigator Coonan placed a piece of paper on the kitchen table near Josilyn.

126.    Investigator Coonan told Josilyn that the letter contained the allegations that had been made against her.

127.    Investigator Coonan suggested that Josilyn contact the Superintendent's Office because they had no record of Josilyn's homeschool paperwork.

128.    Josilyn told Investigator Coonan that she had left a folder at her door containing the homeschool paperwork she had sent to the Superintendent's Office months before.

129.    Investigator Coonan told Josilyn that the police had seen the folder at Josilyn's door and had taken it.

130.    Investigator Coonan repeated that the Superintendent's Office had told her that they had no record of Josilyn's homeschool paperwork.

131.    Investigator Coonan told Josilyn that she had spoken with a woman named "Leslie" at the Superintendent's Office, and that Leslie had told Investigator Coonan that according to a new Massachusetts law, children had to continue attending public school until their homeschool plan was officially approved.

132.    Investigator Coonan told Josilyn that this new law had "just started a few months ago," and that Josilyn had broken it.

133.    Josilyn told Investigator Coonan that she didn't understand this.

134.    Investigator Coonan told Josilyn that she needed to contact the Superintendent's Office to discuss this law change with them, and to discuss why the Superintendent's Office had no record of her homeschool paperwork.

135.    Investigator Coonan and the officers then moved toward A.S., who was in the apartment.

136.    A.S. was visibly upset as the officers and Investigator Coonan approached him.

137.    Investigator Coonan and the officers proceeded to question A.S. while Josilyn remained handcuffed and seated on a chair in her kitchen.

138.    As Investigator Coonan and the officers continued to question A.S., five additional police officers arrived at Josilyn's home and began to search through it.

139.    While Investigator Coonan continued to question A.S., the police arrested Josilyn, removed her from the home, placed her in a squad car, and took her to the police station.

140.    At the police station, Josilyn was booked and paid bail.

141.    Upon paying bail, Josilyn was released and picked up her son from her brother's house.

142.    Josilyn and A.S. returned to their home around 7:00 p.m. on March 30, 2018.

143.    No charges were filed against Josilyn.

144.    On information and belief, at no time prior to entering Josilyn's home on March 30, 2018 did Investigator Coonan receive any allegations regarding any concerns about A.S.'s safety.

145.    On information and belief, at no time prior to entering Josilyn's home on March 30, 2018 did Investigator Coonan receive any allegations regarding the condition of Josilyn's home.

146.    On information and belief, at no time prior to entering Josilyn's home on March 30, 2018 did Investigator Coonan receive any allegations regarding A.S. other than that he had accumulated absences from Woodland Academy.

147.    On April 2, 2018, Investigator Coonan sent an e-mail to Josilyn stating that "it was very unfortunate what happened on Friday afternoon."

148.    In her e-mail, Investigator Coonan also stated that "the Department does not have concern for a child being home schooled but the law states the child needs to be enrolled in school or be officially approved by the local school department to be homeschooled."

149.    On April 5, 2018, the Department concluded that the allegation of educational neglect against Josilyn would be "supported" because Josilyn was "not ensuring Adrian's educational needs are being met as the child is not attending school and mother is not approved to homeschool."

150.    The Department also found the allegation of educational neglect "supported" because A.S. had "missed 48 days of school" and the Worcester Superintendent's Child Study Department "reported it is now the law that a child cannot be removed from school to be homeschooled until it is fully approved."

151.    In a letter dated April 5, 2018, the Department informed Josilyn of its substantiated finding of educational neglect and advised her of her opportunity to appeal that determination.

152.    On April 10, 2018, Josilyn attended a hearing before the juvenile court on the ADF complaint filed by Worcester Public Schools which alleged that Josilyn had failed to send A.S. to school.

153.    At the hearing on April 10, 2018, the magistrate continued the matter to April 27, 2018.

154.    The magistrate instructed Worcester Public Schools and Josilyn to consult on and approve a homeschool instructional plan by April 27, 2018.

155.    The magistrate instructed Worcester Public Schools and Josilyn that if the homeschool instruction plan was not approved by April 27, 2018, the matter would be taken up again by the juvenile court.

156.    The magistrate did not order Josilyn to send A.S. to Woodland Academy while her instructional plan was being considered by Worcester Public Schools.

157.    On April 10, 2018, Josilyn submitted a second instructional plan to the Superintendent's Office. As in her first instructional plan, Josilyn's second instructional plan stated that she would be homeschooling A.S. for the remainder of the school year, and that she would provide instruction in reading, writing, geography, mathematics, arithmetic, history,

science, technology, music, art, health, physical education, and religion, and that she would provide dated work samples to the Superintendent's office upon request.

158.　On April 23, 2018, Josilyn called the Superintendent's Office and left a voicemail asking for an update on the status of her instructional plan.

159.　On April 24, 2018, Josilyn e-mailed the Superintendent's Office and asked for an update on the status of her instructional plan.

160.　On April 24, 2018, the juvenile court dismissed the ADF complaint that Worcester Public Schools had filed against Josilyn.

161.　On April 25, 2018, Josilyn received an e-mail from Leslie Fuller in the Superintendent's Office, who advised Josilyn that her instructional plan could now be approved because the ADF complaint before the juvenile court had been dismissed.

162.　On May 4, 2018, Josilyn, through counsel, mailed a letter to Superintendent Binienda, asking that the Superintendent's Office approve Josilyn's instructional plan or provide a list of suggested revisions.

163.　On May 9, 2018, the Superintendent's Office finally informed Josilyn that her homeschool plan had been approved.

**E.　The Department's care and protection petition is dismissed.**

164.　On May 1, 2018, Sarah Holland, a DCF investigator employed by the Department of Children and Families, filed a care and protection petition against Josilyn in the juvenile court, requesting that the court transfer custody of A.S. to the Department.

165.　Investigator Holland's supporting affidavit alleged that the Department learned on May 1, 2018 that "the home-schooling application was filed on April 10, 2018; however, the

program [referring to the Superintendent's Office] is denying the child due to concerns with absences and pending legal charges from an ADF."

166.     On information and belief, Investigator Holland's statement in her affidavit was based on a statement made by Ms. Gloria McKibben, a school psychologist with Worcester Public Schools, who told another DCF investigator on May 1, 2018, that the Superintendent's Office would not approve Josilyn's homeschool plan because the ADF was still pending.

167.     In actual fact, the ADF had been dismissed on April 24, 2018.

168.     In addition, Secretary Leslie Fuller from the Superintendent's Office had informed Josilyn on April 25, 2018 that her instructional plan would now be approved because the complaint filed by Worcester Public Schools had been dismissed on April 24, 2018.

169.     On May 8, 2018, the juvenile court set a hearing on the care and protection petition for November 6, 2018.

170.     In July 2018, the Juvenile Court appointed a special investigator to conduct an independent review of the Department's petition against Josilyn.

171.     The special investigator reviewed the Department's records on Josilyn and conducted independent interviews with Investigator Holland, Josilyn, and A.S.

172.     On August 14, 2018, the special investigator submitted her findings to the juvenile court.

173.     The special investigator found that Josilyn had filed all correct homeschool paperwork required under Massachusetts law.

174.     The special investigator found that Josilyn had provided the required paperwork numerous times to both Superintendent Binienda and Woodland Academy.

175.     The special investigator found that the Department of Children and Families did not review A.S.'s educational records prior to filing the petition.

176.     The special investigator found that the Department of Children and Families became involved in a dispute between the school and the parent.

177.     The special investigator found that the Department's entry into Josilyn's home on March 30, 2018 was unnecessary and traumatizing to the child.

178.     The special investigator concluded her report by recommending that the juvenile court dismiss the care and protection petition.

179.     On August 15, 2018, the juvenile court adopted the recommendations of the special investigator and dismissed the Department's care and protection petition.

**F.     *Josilyn overturns the Department's supported finding of educational neglect.***

180.     On May 4, 2018, Josilyn, through counsel, timely filed a request for a fair hearing to challenge the Department's decision on April 5, 2018 to "support" the allegation of educational neglect.

181.     On May 4, 2018, Josilyn also filed a request to review the Department's records related to its decision to "support" the allegation of educational neglect.

182.     On May 4, 2018, the Department confirmed receipt of Josilyn's request for a fair hearing and set a hearing date of June 14, 2018.

183.     On June 5, 2018, the Department provided Josilyn with an electronic copy of the Department's records related to its decision to "support" the allegation of educational neglect.

184.     The Department's records revealed that on March 15, 2018, a report was filed with the Department alleging that Josilyn was neglecting the education of A.S., who had accumulated 48 absences from Woodland Academy.

185.    The reporter also alleged that Josilyn had said she was homeschooling A.S., but that she had not started the homeschool process and that the school would be filing a complaint in the juvenile court the following day.

186.    On information and belief, the reporter was Defendant Jane Doe, an unknown employee of Woodland Academy.

187.    On information and belief, Ms. Doe reported Josilyn to the Department because the Worcester School Committeee's written attendance policy, which states that "[w]hen a student accumulates excessive unexcused absences, the principal (or his/ her designee) may seek assistance from the Juvenile Court and/or the Department of Children and Families to resolve attendance matters."

188.    A.S. was not enrolled as a student in Woodland Academy on March 15, 2018, and had not been enrolled in Woodland since January 11, 2018.

189.    Worcester School Committee's written attendance policy required Woodland Academy to notify Josilyn in writing if A.S. accumulated more than five unexcused absences.

190.    On information and belief, the employee at Woodland Academy reported Josilyn to the Department even though Josilyn had not been provided written notice after A.S. allegedly accrued more than five unexcused absences.

191.    Worcester School Committee's written attendance policy required Woodland Academy to request a meeting with Josilyn to discuss A.S.'s alleged absences from school.

192.    On information and belief, the employee at Woodland Academy reported Josilyn to the Department even though Woodland Academy had not previously contacted Josilyn to request a meeting to discuss A.S.'s alleged absences from school.

193.    Nevertheless, the Department screened in the report against Josilyn as a report of "neglect" for a non-emergency response on March 15, 2018.

194.    The Department's records further revealed that around 11:00 a.m. on March 28, 2018, Investigator Coonan attempted to contact Woodland Academy's School Adjustment Counselor regarding the report filed against Josilyn.

195.    This is the first recorded instance where Investigator Coonan attempted to contact a school official regarding the allegations against Josilyn.

196.    The School Adjustment Counselor did not answer her phone, and Investigator Coonan did not leave a voicemail message.

197.    The Department's records further revealed that around 11:00 a.m. on March 29, 2018, Investigator Coonan contacted the juvenile court clerk and learned that Worcester Public Schools had filed a complaint against Josilyn that was scheduled for a hearing on April 10, 2018.

198.    At around 11:30 a.m. on March 29, 2018, Investigator Coonan placed a call to the Superintendent's Office to ask about the process of homeschooling.

199.    According to the Department's records, Investigator Coonan spoke with a woman identified as "secretary Leslie."

200.    On information and belief, "secretary Leslie" was Leslie Fuller, who was employed by the Superintendent's Office as a secretary.

201.    According to the Department's records, Secretary Leslie told Investigator Coonan that the Superintendent's Office did not have a homeschool application for A.S.

202.    Josilyn had submitted her homeschool plan to Superintendent Binienda twice by electronic mail, on January 11, 2018 and again on January 23, 2018.

- 26 -

203.    Secretary Leslie told Investigator Coonan that Massachusetts had recently passed a new homeschool statute which said that a child must continue to attend school until their application to homeschool is fully accepted.

204.    Massachusetts law does not require that children remain enrolled in public school until their homeschool plan is approved.

205.    On information and belief, when Secretary Leslie told Investigator Coonan that a child must continue to attend school until their application to homeschool is fully accepted, she was referring not to any Massachusetts law but to the Worcester School Committee's homeschool policy, which states that "students must attend their assigned school until approval has been received."

206.    At Josilyn's fair hearing on June 14, 2018, Investigator Coonan admitted under oath that Secretary Leslie did not advise Investigator Coonan about *Charles* when advising Investigator Coonan about the requirements to homeschool.

207.    The Department's records further revealed that around 1:00 p.m. on March 29, 2018, Investigator Coonan spoke by telephone to Jean Conway from the Superintendent's Office.

208.    Ms. Conway told Investigator Coonan that Josilyn had never made an inquiry or application for A.S. to be homeschooled.

209.    Josilyn had contacted the Superintendent's Office regarding her homeschool plan on January 11, 2018, January 23, 2018, and March 9, 2018.

210.    The Department's records further revealed that at approximately 2:00 p.m. on March 29, 2018, Investigator Coonan spoke with Ms. Elaine Kline, the School Adjustment Counselor at Woodland Academy.

211.    Ms. Kline told Investigator Coonan that Principal Padilla of Woodland Academy had sent e-mails to Josilyn regarding her decision to homeschool and that Josilyn had never replied.

212.    Josilyn had withdrawn A.S. from Woodland Academy on January 11, 2018.

213.    Josilyn e-mailed Principal Padilla a courtesy copy of her homeschool plan on January 16, 2018.

214.    Josilyn never received a response to the message she sent to Principal Padilla on January 16, 2018.

215.    The Department's records further revealed that at approximately 1:30 p.m. on March 29, 2018, Investigator Coonan sent a certified letter to Josilyn stating that she would return to Josilyn's house the following week, on April 3, 2018, at 11:00 a.m. Investigator Coonan's letter further stated that "if we are unable to observe your child we will have to have a legal consultation."

216.    At approximately 3:00 p.m. on March 29, 2018, Investigator Coonan arrived unannounced at Josilyn's home and left a copy of the certified letter.

217.    The Department's records further revealed that on March 30, 2018, Investigator Coonan reviewed Josilyn's e-mail from the night before, which informed Investigator Coonan that Josilyn had sent her homeschool plan to the Superintendent's Office in January 2018 and that parents are not required by law to send their children to public school until a homeschool plan is approved.

218.    Upon reviewing Josilyn's e-mail, Investigator Coonan's supervisor, Suzanne Cardona, contacted the Worcester Police Department and asked them to send officers to Josilyn's home to conduct a well-being check on A.S.

- 28 -

219.    The dispatcher agreed and dispatched two officers to conduct a well-being check at Josilyn's home.

220.    The officers proceeded to Josilyn's home at approximately 10:30 a.m. on March 30, 2018, and spoke with Josilyn's father, who told them Josilyn would be returning to the house within the hour.

221.    While they were at Josilyn's home, the officers consulted with Supervisor Cardona.

222.    Supervisor Cardona and the officers agreed that Investigator Coonan and the officers return to Josilyn's home within the hour.

223.    On information and belief, DCF Supervisor Cardona, Investigator Coonan, and the officers agreed to return to Josilyn's home within the hour with the purpose of entering Josilyn's home so that Investigator Coonan could interrogate Josilyn and A.S. over Josilyn's stated objection.

224.    The Department's records further revealed that when Investigator Coonan and the Officers returned to Josilyn's home, they saw the blue folder outside the door and one of the officers looked inside.

225.    Without pausing to review the contents of this folder, "SWAT [sic] officers arrived and entry was forced into the apartment."

226.    According to the Department's records, the contents of this folder "was later determined to be the letter she addressed to the Worcester Public Schools Superintendent in regards to home schooling."

227. At Josilyn's fair hearing on June 14, 2018, Investigator Coonan stated under oath that the allegation of educational neglect was only supported because A.S. was reported to have missed 48 days of school.

228. At Josilyn's fair hearing on June 14, 2018, Investigator Coonan stated under oath that if A.S. had only missed a few days of school, instead of 48 days of school, the Department would not have supported a finding of neglect.

229. At Josilyn's fair hearing on June 14, 2018, Investigator Coonan admitted under oath that she did not ask to review any of A.S.'s education or attendance records.

230. At Josilyn's fair hearing on June 14, 2018, Investigator Coonan admitted under oath that she did not ask Ms. Woodward, Ms. Kline, or Secretary Leslie how many of A.S.'s alleged absences from school accrued before A.S. was withdrawn from Woodland Academy on January 11, 2018, and how many were accrued after January 11, 2018.

231. At Josilyn's fair hearing on June 14, 2018, Investigator Coonan admitted under oath that the Department did not know how many of A.S.'s alleged 48 absences accrued before A.S. was withdrawn from Woodland Academy on January 11, 2018, and how many were accrued after January 11, 2018.

232. At Josilyn's fair hearing on June 14, 2018, Investigator Coonan admitted under oath that she did not ask Josilyn for any details about her instruction of A.S. at home after January 11, 2018.

233. At Josilyn's fair hearing on June 14, 2018, Investigator Coonan admitted under oath that she did not ask to review any of Josilyn's homeschool or attendance records.

234. Josilyn provided A.S. with thirty hours of weekly instruction at home from January 11, 2018 through April 5, 2018.

235.    In October 2018, the Department informed Josilyn that the hearing officer had recommended that the Department's finding of educational neglect be reclassified as "unsupported."

236.    Josilyn is currently homeschooling A.S. in the County of Worcester and plans to continue homeschooling A.S. in the County of Worcester during the 2019-2020 school year and subsequent school years.

237.    Josilyn will be legally required to submit, and plans to submit, an educational plan to the Superintendent of Worcester Public Schools at the start of the 2019-2020 school year and subsequent school years.

238.    Upon filing her educational plan with the Superintendent of Worcester Public Schools at the start of the 2019-20120 school year and subsequent school years, Josilyn's educational plan will be subject to approval by the Superintendent or School Committee, in accordance with the School Committee's unconstitutional homeschooling policy.

239.    While Josilyn's homeschool plan for the 2019-2020 school year and subsequent school years is pending approval by the Superintendent or School Committee, Josilyn will be subject to the School Committee's unconstitutional homeschooling and attendance policies.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell v. Dep't of Social Servs. of the City of New York***

**Adoption and Enforcement of an Unconstitutional Policy that Interferes with the
Fundamental Right of Parents to Direct the Education of their Children
By all Plaintiffs against Defendant Worcester School Committee**

240.    The allegations contained in paragraphs 1 through 239 are hereby realleged and incorporated by reference herein.

241.    The Committee's homeschool and attendance policies deprived Josilyn, and
deprive all other families in the City of Worcester, of their right under *Charles* to immediately
withdraw their children from public school and enroll them in a homeschool program.

242.    It is clearly established in both this Circuit and the Commonwealth of
Massachusetts that a fit parent has a fundamental right to direct the education of her child. At the
core of this right stands a parent's freedom to choose between all lawful forms of education
available to her child, whether public, private, or home-based instruction. The Commonwealth of
Massachusetts clearly recognizes homeschooling as a lawful form of education by both statute
and judicial decision. The Supreme Judicial Court held in *Charles* that parents are free to
homeschool their child while approval is pending, and that school officials cannot interfere with
this decision by insisting on public school attendance prior to approval, unless they first prove
that "the instruction outlined in the home school proposal fails to equal 'in thoroughness and
efficiency, and in the progress made therein, that in the public schools in the same town . . . .'"

243.    Rather than following *Charles*, the Worcester School Committee has adopted a
written policy which states that "Students must attend their assigned school until approval has
been received." Contrary to *Charles*, this official policy authorizes school administrators and
attendance officers to mark a child "absent" even though the parent has withdrawn the child from
public school and a homeschool plan is before the School Committee or Superintendent for
approval. By insisting that a homeschooled child continue to attend public school, the
Committee's homeschool policy overrides the educational decision of a fit parent without
satisfying the burden of proof imposed by *Charles*. This interference is unnecessary, unlawful,
and unconstitutional.

244.    In addition, the Committee further interferes with the right of parents to direct the education of their children by adopting a written attendance policy which states that "[w]hen a student accumulates excessive unexcused absences, the principal (or his/ her designee) may seek assistance from the Juvenile Court and/or the Department of Children and Families to resolve attendance matters." *Charles* recognized that a dispute between parents and school officials about homeschooling raises special constitutional concerns and established a specific procedure for handling these disputes with an eye toward those concerns. The *Charles* procedure calls for communication and discussion between parents and school officials, ideally in an expedited manner. It does not authorize school officials to abdicate their role in the communication process to the Department by filing a report for educational neglect.

245.    Pursuant to these unconstitutional policies, Woodland Academy continued to mark A.S. absent until March 12, 2018, even though Josilyn withdrew A.S. from Woodland on January 11, 2018. Then, without contacting Josilyn about A.S.'s alleged absences or providing her an opportunity to explain them, school officials at Woodland reported Josilyn to the Department on suspicions of educational neglect. As a result of the Committee's policies, Josilyn was subjected to a months-long investigation for wrong-doing even though her decisions were lawful under G.L. ch. 76, § 1, and constitutionally protected under *Charles*. Josilyn was penalized for exercising her constitutional right to choose homeschooling.

246.    As a result of the civil rights violations described above, Josilyn and A.S. have suffered and will continue to suffer for an as yet undetermined length of time the following:

    a.   Mental pain and suffering;

    b.   Emotional distress; and

    c.   Loss of enjoyment of life.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

**Interference under color of law with the Fundamental Right of Parents to
Direct the Education of their Children in violation of the Fourteenth Amendment
By all Plaintiffs against Defendant Jane Doe**

247.    The allegations contained in paragraphs 1 through 246 are hereby realleged and

incorporated by reference herein.

248.    In January 2018, Josilyn exercised her constitutional and statutory right to enroll

A.S. in a homeschool program and to withdraw A.S. from Woodland Academy pending approval

of her homeschool plan. Josilyn memorialized her decision by filing a written notice of

withdrawal from Woodland Academy on January 11, 2018, and by providing Woodland

Academy with a courtesy copy of the instructional plan pending before the Worcester School

Committee on January 16, 2018.

249.    As of January 11, 2018, A.S. was no longer required by law to attend Woodland

Academy. And as of January 16, 2018, Woodland Academy had actual or constructive notice

that A.S. was both withdrawn from Woodland and enrolled in a homeschool program. At either

point in time, Woodland Academy had no legal authority to mark A.S. "absent." Moreover,

Woodland Academy was required by both School Committee policy and by state statutes to

provide written notice to Josilyn after every fifth unexcused absence from school, and to provide

her with a reasonable opportunity to address attendance issues.

250.    Rather than following these clear directives, Defendant Jane Doe reported Josilyn

to the Department of Children and Families for educational neglect. In so doing, she set in

motion a series of events that she knew or should have known would cause the Department to

launch an invasive investigation of Josilyn that would interfere in Josilyn's constitutional right to

homeschool A.S. while approval of her homeschool plan was pending before the School

Committee.

251.    As a result of the civil rights violations described above, Josilyn and A.S. have

suffered and will continue to suffer for an as yet undetermined length of time the following:

    a.   Mental pain and suffering;

    b.   Emotional distress; and

    c.   Loss of enjoyment of life.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

**Interference under color of law with the Fundamental Right of Parents to
Direct the Education of their Children, and the Fundamental Right of
Parents and Children to Family Integrity, Familial Privacy, and Intimate Association
in violation of the Fourteenth Amendment
By all Plaintiffs against Defendants Suzanne Cardona and Adrieanna Coonan**

252.    The allegations contained in paragraphs 1 through 251 are hereby realleged and

incorporated by reference herein.

253.    On March 29, 2018, Josilyn informed Investigator Coonan that she had submitted

an educational plan to Superintendent Binienda for approval in January 2018, that she had

received no reply from Superintendent Binienda, and that neither Superintendent Binienda nor

the Worcester School Committee had asked her to provide any additional information or to

correct any deficiencies in her educational plan. In addition, Josilyn correctly told Investigator

Coonan that parents in Massachusetts are not required to continue to send their children to public

school while approval for the education plan is pending, and correctly encouraged Investigator

Coonan to review *Charles*.

254.    On March 30, 2018, a reasonable investigator who possessed the information Investigator Coonan possessed would have had significant doubts about the allegations that had been made against Josilyn. A cursory review of the Commonwealth's homeschool statute would have revealed that there were no recent changes to the law. Likewise, *Charles* explicitly stated that approval to homeschool is not required prior to withdrawing a child from public school. Josilyn had also told Investigator Coonan that an education plan had been filed with Superintendent Binienda in January, and Investigator Coonan failed to follow-up with the Superintendent's Office to verify if this was in fact the case. Nor did Investigator Coonan review, or request to review, any educational or attendance records for A.S. maintained by the Superintendent's Office or Woodland Academy. Finally, when Investigator Coonan arrived at Josilyn's home, she discovered a folder containing Josilyn's homeschool plan and the withdrawal form from Woodland Academy. Faced with this information, a reasonable investigator would have recognized that the matter at hand involved a dispute between a parent and school officials over filed paperwork, and would not have threatened to forcibly enter Josilyn's home and interrogate Josilyn and her son without first verifying if Josilyn's account was accurate.

255.    Rather than heeding Josilyn's advice or further investigating Josilyn's claims about Massachusetts' homeschool law or *Charles*, Supervisor Cardona contacted the Worcester Police Department and asked them to visit Josilyn's home. When the police reported that Josilyn was not present, but that she was expected to return shortly, Supervisor Cardona, Investigator Coonan, and the police entered into a plan for Investigator Coonan to return to Josilyn's home with the officers, who were armed and in uniform, for the purpose of entering it and interrogating A.S., over Josilyn's stated objection. Upon arriving at Josilyn's home, Investigator Coonan and

the officers discovered a folder containing Josilyn's educational plan and withdrawal form from Woodland Academy. Rather than evaluating this new information, which would have confirmed Josilyn's statements that Worcester Public Schools had been provided with Josilyn's homeschool plan for months, Investigator Coonan and the officers demanded entry into Josilyn's home and threatened to break down her door and enter forcibly if she did not comply. Josilyn was then physically restrained while Investigator Coonan proceeded to interrogate Josilyn and A.S. in their own home for over an hour.

256.    By relying on information that a reasonable investigator knew or should have known was specious, and by contacting the Worcester Police Department for assistance in entering Josilyn's home over her objection, Supervisor Cardona and Investigator Coonan set in motion a series of events that they knew or should have known would cause the officers to seize and detain Josilyn and A.S. in violation of their Fourteenth Amendment rights to privacy, intimate association, and family integrity. Furthermore, upon entering Josilyn's home, Investigator Coonan worked in concert with the police to interfere in Josilyn's parent-child relationship with A.S., who restrained Josilyn so that Investigator Coonan could interrogate A.S. without Josilyn's permission and against her wishes.

257.    As a result of the civil rights violations described above, Josilyn and A.S. have suffered and will continue to suffer for an as yet undetermined length of time the following:

a.    Mental pain and suffering;

b.    Emotional distress; and

c.    Loss of enjoyment of life.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983

**Unreasonable search and seizure under color of law
In violation of the Fourth Amendment
By A.S. against Defendants Suzanne Cardona and Adrienna Coonan**

258.     The allegations contained in paragraphs 1 through 257 are hereby realleged and incorporated by reference herein.

259.     Prior to arriving at Josilyn's home, Supervisor Cardona contacted the Worcester Police Department and asked them to visit Josilyn's home. When the police reported that Josilyn was not present, but that she was expected to return shortly, Supervisor Cardona, Investigator Coonan, and the police entered into a plan for Investigator Coonan to return to Josilyn's home with the officers, who were armed and in uniform, for the purpose of entering it and interrogating A.S., over Josilyn's stated objection. Upon arriving at Josilyn's home, Investigator Coonan, at the direction of Supervisor Cardona and in consultation and cooperation with officers of the Worcester Police Department, demanded entry into Josilyn's home and threatened to break down her door and enter forcibly if she did not comply. These words were followed by loud banging on the outside of the doorway. Believing that the officers were making good on their threat to forcibly enter her home, and fearing that a forcible entry would significantly upset her young son, Josilyn felt compelled to open the door in order to avoid a forcible entry. Upon opening the door, Josilyn was immediately seized, handcuffed, and forced to sit in a chair in her own kitchen. Investigator Coonan interrogated Josilyn, and then A.S., as additional officers entered Josilyn's home to collect information about Josilyn and A.S.

260.     By their actions on March 30, 2018, Supervisor Cardona and Investigator Coonan set in motion a series of events that they knew or should have known would cause the officers to unreasonably seize and interrogate Josilyn and A.S. through the threat and use of physical force.

The officers, at Supervisor Cardona's direction, were dispatched to Josilyn's home with instructions to enter it when they first arrived on March 30, 2018. And but for the officers' subsequent fortuitous discovery of an outstanding bench warrant for a partially-paid fine, the officers' forcible entry into Josilyn's home, as well as their seizure of Josilyn, would have clearly been unreasonable under the Fourth Amendment.

261.    Upon returning to and entering Josilyn's home, Investigator Coonan and the officers failed to act under the confines of the bench warrant. Instead, the officers handcuffed Josilyn and forced her to sit in her own kitchen while Investigator Coonan and the officers found A.S. Upon seeing A.S., Investigator Coonan used the threat of force from the officers, who had restrained Josilyn in handcuffs, as a stalking horse to interrogate A.S. for over an hour without Josilyn's permission, against Josilyn's wishes, and without prior judicial approval. Neither Josilyn nor A.S. were free to leave while Investigator Coonan and the officers conducted their lengthy interrogation.

262.    Although the bench warrant authorized the police to arrest Josilyn for a partially-paid fine, it did not authorize the police, Supervisor Cardona, or Investigator Coonan to compel Josilyn to open her door, search the interior of Josilyn's home, or seize and interrogate A.S. for over an hour. It was clearly established on March 30, 2018, that Josilyn's home was entitled to heightened constitutional protections, and any warrantless search or seizure inside her home would be both presumptively and *per se* unreasonable. Even so, Supervisor Cardona contacted the Worcester Police Department based on allegations that Josilyn had refuted and that any reasonable investigator would have investigated further, and requested that uniformed, armed officers return to Josilyn's home to assist Investigator Coonan in gaining entry into Josilyn's home. In so doing, Supervisor Cardona and Investigator Coonan set in motion a series of events

that she knew or should have known would gain her entry into Josilyn's home over Josilyn's

objection, and upon entering Josilyn's home seized and interrogated A.S. even though the arrest

order did not authorize them to do so. As a direct result of Supervisor Cardona and Investigator

Coonan's actions, A.S. was unreasonably seized, detained, interrogated, and removed from his

home in violation of his right to be free from unreasonable searches and seizures under the

Fourth Amendment.

263.    As a result of the civil rights violations described above, A.S. has suffered and

will continue to suffer for an as yet undetermined length of time the following:

      a.  Mental pain and suffering;

      b.  Emotional distress; and

      c.  Loss of enjoyment of life.

## FIFTH CAUSE OF ACTION

### G.L. ch. 231A, § 1

**Declaration and Judgment of Rights pursuant to the
Massachusetts Declaratory Judgment Act
By all Plaintiffs against
Defendants Worcester School Committee and Superintendent Binienda**

264.    The allegations contained in paragraphs 1 through 263 are hereby realleged and

incorporated by reference herein.

265.    Parents who submit an educational plan to the Superintendent for approval

comply with Massachusetts law and with *Charles*. If a parent decides to withdraw her child from

public school while approval is pending, her decision is lawful and constitutionally protected

under *Charles*. She has not committed an unlawful act and should not be subjected to any

penalty for exercising her constitutional rights.

- 40 -

266.     The School Committee's current policies instruct school officials to record all

homeschooled children as unlawfully absent from school, and then to report the children and

their parents to the Department for educational neglect, until such time as the approval is

finalized. Because these policies injured the Plaintiffs, and because the acts authorized by these

polices are capable of repetition but are routinely disposed of before judicial relief can be

obtained, the Plaintiffs ask this Court for a declaration and judgment that the School

Committee's policy of requiring homeschooled students to continue attending public school until

their approval is finalized is unlawful under both state law and the federal Constitution.

Likewise, the Plaintiffs ask this Court for a declaration and judgment that when the School

Committee or Superintendent disagree with the parents on whether to approve a homeschool

plan, the Committee and Superintendent must follow the procedure for resolving disputes set

forth in *Charles*, rather than reporting the family to the Department.

### SIXTH CAUSE OF ACTION

**G.L. ch. 231A, § 1**

**Declaration and Judgment of Rights pursuant to the**
**Massachusetts Declaratory Judgment Act**
**By all Plaintiffs against**
**Defendant Massachusetts Department of Children and Families**

267.     The allegations contained in paragraphs 1 through 266 are hereby realleged and

incorporated by reference herein.

268.     The Department of Children and Families defines "neglect" as the "failure by a

caretaker, either deliberately or through negligence or inability, to take those actions necessary to

provide a child with minimally adequate food, clothing, shelter, medical care, supervision,

emotional stability and growth, or other essential care. . . ." 110 C.M.R. 2.00. The definition

omits any reference to "education." Moreover, a parent who submits a homeschool plan for

approval by her Superintendent or School Committee, and then removes her child from public school pending approval, has exercised a choice lawfully available to her and protected by *Charles*. A parent who makes this choice is neither guilty of "failing" her child, nor commits an act of "neglect."

269.    When the Department investigates a parent solely because the parent has withdrawn her child from public school while her homeschool plan is awaiting approval, the Department inserts itself into a dispute that *Charles* reserves solely for parents and school officials. Departmental involvement in such a dispute is contrary to *Charles*, which commands school officials to communicate expeditiously with parents to resolve the matter, and exposes the family to unnecessary interventions and intrusions that implicate core familial privacy rights.

270.    Because the Plaintiffs were injured as a result of a Department investigation rooted solely in allegations over missing homeschool paperwork, and because such investigations are capable of repetition in the future but are routinely disposed of before judicial relief can be obtained, the Plaintiffs ask this Court for a declaration and judgment that if the Department receives a report of educational neglect, and the Department discovers during its investigation that the report was made because the parents and school officials disagree on whether a homeschool plan should be approved, the Department should refer the matter back to the School Committee or Superintendent for resolution under *Charles* instead of making a finding of educational neglect.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that this Court:

A.     Award compensatory damages in favor of each of the individual Plaintiffs against Worcester Public Schools for injuries suffered on account of the unconstitutional provisions of its homeschool and attendance policies, in an amount to be determined by the finder of fact in accordance with the proof, plus interest at the legal rate until paid;

B.     Issue a declaratory judgment that the policies of the Worcester School Committee complained of herein are illegal and unconstitutional;

C.     Issue a permanent injunction, enjoining the Worcester School Committee from enforcing the provision of its homeschool policy that requires students to continue attending public school until their homeschool plan has been approved;

D.     Issue a permanent injunction enjoining the Worcester School Committee from reporting a parent or child to the Department of Children and Families for educational neglect because a child has been marked "absent" while the homeschool plan is pending approval;

E.     Issue a declaratory judgment that if the Department of Children and Families receives a report of educational neglect, and the Department discovers during its investigation that the report was made because the parents and school officials disagree on whether a homeschool plan should be approved, the Department should refer the matter back to the School Committee or Superintendent for resolution under *Charles* without making any finding of educational neglect;

F.     Issue an order expunging all assessments, records, reports, documentation, photographs, data, and all other information collected and maintained by the Department of

Children and Families in connection with the report of educational neglect made against Josilyn

Goodall on March 15, 2018;

G.     Award plaintiffs' costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

H.     Grant such other and further relief as the Court deems proper; and

I.      Grant the plaintiffs a trial by jury when the issues are joined.


Respectfully submitted this 30th day of November, 2018:


**JOSILYN GOODALL**,
By her attorney,



__ *"/s/" Robert G. Caprera*  _____
Robert G. Caprera (BBO # 073120)
rob@capreralaw.com
CAPRERA & CAPRERA
32 Everett Street
Southbridge, MA 01550
(508) 764-3297
(508) 764-7445 (fax)