# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOSILYN GOODALL, Individually and as next friend,** ) <br> **as nest friend of A.S., a minor child,** ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **WORCESTER SCHOOL COMMITTEE** ) <br> **MAUREEN BINIENDA, in her official capacity as** ) <br> **Superintendent of Worcester Public Schools,** ) <br> **LINDA SPEARS, in her official capacity as** ) <br> **Commissioner of the Massachusetts Department of** ) <br> **Children and Families,** ) <br> **SUZANNE CARDONA, in her individual capacity,** ) <br> **ADRIENNA COONAN, in her individual capacity, and** ) <br> **JANE DOE, in her individual capacity.** ) <br> **Defendants.** ) | **CIVIL ACTION** <br> **NO. 18-40199-TSH** |

## MEMORANDUM OF DECISION AND ORDER
### September 25, 2019

### Background

Jane Goodall, individually ("Goodall") and as next friend of her minor child, A.S.,

("A.S" and together with Goodall, "Plaintiffs") have brought an action against the Worcester

School Committee ("School Committee"), Maureen Binienda, in her official capacity as

Superintendent of Worcester Public Schools ("Superintendent" and, together with the School

Committee, the "Worcester School Defendants"), Linda Spears, in her official capacity as

Commissioner of the Massachusetts Department of Children and Families ("Commissioner"),

Suzanne Cardona, in her individual capacity ("Cardona"), Adrienne Coonan, in her individual

capacity ("Coonan" and, together with the Commissioner, and Cardona, the "DFC Defendants") and Jane Doe, in her individual capacity ("Doe") alleging claims under 42 U.S.C. §1983 for (1) implementation of policies interfering with a parent's fundamental right to direct the education of their children and/or the fundamental rights of parents and children to family integrity, familial privacy, and intimate association ; and/or (2) illegal search and seizure.  Plaintiffs also seek a declaration and judgment of rights pursuant to the Massachusetts Declaratory Judgment Act, Mass.Gen.L. ch. 231A, §1 ("Chapter 231A") regarding a parent's right to decide to withdraw her child from school, and a declaration that such parent's conduct does not constitute "neglect."   Plaintiffs request monetary damages, and injunctive relief.

This Memorandum of Decision and Order addresses Commonwealth's Motion To Dismiss Counts 3,4 and 6 From the Complaint (Docket No. 8); Defendant Worcester School Committee and Superintendent Maureen Binienda's Motion To Dismiss the First and Fifth Causes of Action From Plaintiff's [sic] Complaint (Docket No. 10); and Plaintiffs'  Motion To Strike Defendant Worcester School Committee's Motion To Dismiss and Supporting Exhibits (Docket No. 15). For the reasons set for the below, the DCF Defendants' and Worcester School Defendants' motions to dismiss are *granted*, in part, and *denied*, in part and Plaintiffs' motion to strike, is *denied*.

### Standard of Review Governing Motions to Dismiss

To overcome a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must allege sufficient facts "to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 667, 129 S. Ct. 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546, 127 S. Ct. 1955 (2007).  The plausibility of a claim is evaluated in a two-step process. *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013).  First, the court must

separate the complaint's factual allegations, which must be accepted as true, from its conclusory legal allegations, which are not entitled to the presumption of truth. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013); *Manning*, 725 F.3d at 43. Second, the court must accept the remaining factual allegations as true and decide if, drawing all reasonable inferences in the plaintiff's favor, they are sufficient to show an entitlement to relief. *Manning*, 725 F.3d at 43. The court draws on judicial experience and common sense in evaluating a complaint, but may not disregard factual allegations even if it seems that actual proof of any particular fact is improbable. *Iqbal*, 556 U.S. at 667, 129 S. Ct. 1949; *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955. A motion to dismiss must focus not on whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims. *Mitchell v. Mass. Dep't of Corr.*, 190 F. Supp.2d 204, 208 (D. Mass. 2002) (quoting *Scheur v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683 (1974)).

## **Facts**

### The Motion To Strike

Before making findings of fact, I must address Plaintiffs' motion to strike the Worcester School Defendants' factual assertions made in support of their motion to dismiss. In some instances, the Worcester School Defendants have expanded on Plaintiffs' factual assertions while in others, they have controverted them. As record support, they cite to the declaration of Maura Mahoney ("Mahoney'), Manager of Social Emotional Learning for the Child Studies Department of the Worcester Public Schools and the following exhibits attached thereto: (*Ex. A*) a copy of the School Committee's Homeschool Policy; (*Ex. B*) a copy of a January 10, 2018 email from Goodall to the Superintendent outlining Goodall's homeschooling plan for A.S.; (*Ex. C*)  a copy of A.S's attendance record for the 2017-2018 school year; (*Ex. D*) a copy of Mahoney's *January*

*16, 2018,* response to Goodall's January 10, 2018 email; (*Ex. E*) a copy of a DCF report of child abuse/neglect regarding A.S.; (*Ex F*) a Failure To Cause School Attendance Affidavit regarding A.S. ; (*Ex. G*) a copy of the complaint filed against Goodall in the Worcester Superior Court by the Worcester Public Schools; (*Ex H*) a copy of an official, completed application to homeschool A.S. for the 2018 academic year filed in April 2018; (*Ex. I*) a copy of an official, completed application to homeschool A.S. for the 2018-2019 academic year; and (*Ex. J*) a copy of the Superintendent's letter notifying Goodall that the application to homeschool A.S. for the 2018-2019 school year had been approved. *See Declaration of Maura Mahoney*, *Defs. Worcester School Comm. And Superintendent Maureen Binienda's Mem. Of L. in Supp. Of Mot. To Dism.* (Docket No. 11), at *Ex. 1* ("Mahoney Decl.").  Plaintiffs have filed a motion to strike all the exhibits on the grounds that they are outside of the pleading and therefore, cannot be considered unless the Court converts the motion to one for summary judgment.  The motion to strike is denied, but for the reasons set forth below, I will not consider specific exhibits or the information contained therein.

In ruling on whether the plaintiff has stated an actionable claim, the inquiring court must consider only the complaint and documents annexed to it; the court cannot consider affidavits and miscellaneous documents proffered by parties, *unless* such other materials are fairly incorporated within the complaint or are susceptible to judicial notice.  *Rodi v. S. New England Sch. Of Law*, 389 F.3d 5, 12 (1st Cir. 2004). Contrary to Plaintiffs' assertion, many of the exhibits included by the Worcester School Defendants contain facts and other information which was repeatedly referenced in the Complaint and therefore, can be said to be "fairly incorporated" therein. These include the following exhibits referenced above: (*Ex. A*) a copy of the School Committee's Homeschool Policy; (*Ex. B*) a copy of a January 10, 2018 email from Goodall to

the Superintendent outlining Goodall's homeschooling plan for A.S., (*Ex. E*) a copy of a DCF report of child abuse/neglect regarding A.S.,  (*Ex. G*) a copy of the complaint filed against Goodall in the Worcester Superior Court by the Worcester Public Schools; (*Ex. H*) a copy of an official, completed application to homeschool A.S. for the 2018 academic year filed in April 2018; (*Ex. I*) a copy of an official, completed application to homeschool A.S. for the 2018-2019 academic year; and (*Ex. J*) a copy of the Superintendent's letter notifying Goodall that the application to homeschool A.S. for the 2018-2019 school year had been approved. Moreover, the Court may take judicial notice of statutes, regulations and formally enacted government policies and procedures. I will accept the Worcester School Defendants' factual assertions based on such records.

It is a close call as to whether I should consider the following exhibits as it is arguable that they have been incorporated into the Complaint by *negative* reference: (*Ex. C*)  a copy of A.S's attendance record for the 2017-2018 school year, (*Ex. D*) a copy of Mahoney*'s* January 16, 2018, response to Goodall's January 11, 2018 email, and (*Ex. F*) a Failure To Cause School Attendance Affidavit regarding A.S.  More specifically, in the complaint, Plaintiffs *repeatedly* decry the fact that the Superintendent's Office never contacted Goodall after she emailed the Superintendent that she was removing A.S. from Woodland Academy ("Woodland") and intended to homeschool him. Yet the Superintendent and School Committee have provided a copy of a prompt response sent to Goodall outlining the procedure she should follow and informing her that until a plan was approved, if A.S. did not attend school he would be deemed absent[1]. Moreover, Goodall makes much of A.S.'s attendance after she informed the

---

[1] In the complaint, Goodall asserts she received a letter on January 16, 2018 "from Woodland Academy" which stated that A.S. was being marked absent form school and was considered truant. It is not clear whether the letter Plaintiffs reference is the one which Mahoney sent on January 16, 2018. In that letter, which is *Ex. D.* to the Mahoney Declaration, Mahoney, who was not with Woodland but rather held an administrative position with the

Superintendent that A.S. was to be homeschooled and states that any prior attendance records should not come into play. The exhibits proffered by the Worcester School Defendants establish that A.S. had a dismal attendance record before Goodall "withdrew" him from Woodland Academy in 2018 and had stopped attending school more than a week before Goodall emailed her homeschool notification to the Superintendent. Moreover, there is evidence cited by the Worcester School Defendants establishing that Goodall ignored other attempts to contact her and set up meetings.  Despite the negative references raised by Plaintiffs' allegations, I have not deemed the information contained in these exhibits incorporated by reference and have not considered them in deciding the motions to dismiss.

While I have chosen not to consider certain exhibits and have not converted the Worcester School Defendants' motion into one for summary judgment, I note that these and other exhibits call into question the veracity of numerous factual allegations asserted in support of Plaintiffs' claims. Plaintiffs' attempt to minimize any culpability for potential misstatements/mischaracterizations by repeatedly including the words "on information and belief," at the beginning of many of their factual assertions is, at best, disingenuous, and, at worst, sanctionable. The Court will reserve considering any possible Rule 11 sanctions until such time as a more complete record has developed.

---

Worcester Public Schools, informed Goodall that she had been forwarded Goodall's homeschool plan for A.S. for review, that she was responsible for oversight of the homeschool process and that in order to have A.S. officially considered a homeschool student, there is a procedure which needed to be undertaken, *starting* with notification to the district that Goodall intended to homeschool her son.  Mahoney informed Goodall that she was sending her a packet that outlined her homeschool plan and that once the required materials were filled out and returned, they would be reviewed, and if all was in order, approved. She then reminded Goodall that until a student's application is reviewed and approved, they must attend school daily or they will be considered truant. Plaintiffs also make other references which suggest that Goodall received the Mahoney letter.  If it was clear that Plaintiffs were referencing the Mahoney letter in the Complaint, I would find it incorporated by reference and consider it in deciding the motion to dismiss. Because I cannot so find with certainty, I will not consider the Mahoney letter at this time.

<u>Findings of Fact</u>

<u>*Home Education in the Commonwealth of Massachusetts.*</u>

The School Committee is the legislative and policy-making body charged with supervision of the Worcester Public School System with authority under Mass.Gen.L., ch. 71, § 37 to establish educational goals and policies for the schools in the district consistent with the requirements of law and statewide goals and standards established by the Massachusetts Board of Education. Under Massachusetts law, a parent may choose between lawful alternative forms of education by enrolling her child in a public day school, another day school approved by the school committee, or by seeing that a child is "otherwise instructed in a manner approved in advance by the superintendent or the school committee." Mass.Gen.L. ch., 76, § 1 ("Chapter 76, §1").

The Supreme Judicial Court of Massachusetts ("SJC") has held that a parent may choose to submit a proposal to homeschool her child pursuant to Mass.Gen.L.  ch., 76, § 1. *Care & Protection of Charles*, 399 Mass. 324, 331, 504 N.E.2d 592 (1987).  In *Charles*, the SJC provides guidelines and procedural requirements for handling disputes between parents and school committees over the approval of a homeschool program.

<u>*The Worcester School Committee's Homeschool Policy.*</u>

The School Committee adopted an official written policy for homeschooling in the City of Worcester ("City") starting with the 2017-18 school year. That policy (the "Homeschool Policy") provides:

**Home Schooling**

Parents/guardians who choose to educate their children at home, as allowed under Massachusetts law, can fulfill the requirements of the compulsory attendance statute by having their educational programs reviewed and accepted in advance by the Worcester Public Schools. The notifications to homeschool (elementary and

secondary versions) are available upon request from the office of the Child Study Department at (508) 799- 3175. Parents are expected to provide evidence of their child's Home Schooling Program once a year.  Students completing high school through Home Schooling Programs are not eligible for a Worcester Public Schools' Diploma. A student being educated through Home Schooling may have access to public school activities of an extra-curricular nature (e.g. sports, clubs) with the approval of the superintendent or designee. The district reserves the right to allow enrolled students to have precedence or priority over the home schooled student with regard to placement on sports teams and activities that have limited enrollment. With approval of the superintendent or designee, and in consultation with the principal, a home schooled student may participate in sports teams and activities that have limited enrollment provided that he or she does not displace an enrolled student. Home schooled students applying to participate in district-sponsored sports must follow the athletic eligibility guidelines ….

The School Committee has also adopted a written policy with regards to nonattendance at school (the "Attendance Policy"). The Attendance Policy states that "Parents and guardians are notified by phone on a daily basis if their child is absent. After five unexcused absences, the principal (or his/her designee) will notify the parent(s) or guardian(s) in writing and, when appropriate, request a meeting to discuss the student's attendance. Parents will continue to receive written notification of their child's attendance at every fifth absence from school. Parents and guardians will also receive attendance information through: (1) Interim and attendance progress reports (at five weeks into each marking period), and (2) Report cards (every ten weeks). The secondary report cards show students' absences from each class and students' total absences from school." The Attendance Policy further states that "[w]hen a student accumulates excessive unexcused absences, the principal (or his/ her designee) may seek assistance from the Juvenile Court and/or the Department of Children and Families ("DCF") to resolve attendance matters." The Attendance Policy was adopted and in force in the City during the 2017-2018 school year.

The School Committee's Homeschool and Attendance Policies are customarily applied by the Superintendent. Pursuant to the Homeschool Policy, a parent who has withdrawn her child

from a public City school and submitted a homeschool plan for approval must continue to cause

her child to attend that public school until the homeschool plan is approved. Moreover, pursuant

to the Homeschool and Attendance Policies, a child who has been withdrawn from public school

to be homeschooled by her parent is marked "absent" by the public school until such time as the

public school receives notice from the School Committee or Superintendent that the child's

homeschool program has been approved. When a child who has been withdrawn from public

school to be homeschooled but is marked "absent" from the public school accumulates excessive

unexcused absences, the City's public schools file a report of educational neglect with the DCF.

### *Goodall's Homeschool Program*

In early January 2018, Goodall decided to homeschool her son, A.S., who was then

enrolled in Woodland, a City public school. On January 11, 2018, Goodall sent the following

homeschool educational plan to the Superintendent, via email, for approval by the

Superintendent or School Committee pursuant to Chapter 76, §1:

Dear Superintendent Binienda:

Education Plan for [A.S]

 I, Josilyn Goodall, the mother of [A.S] will be homeschooling him,
effective immediately for the remainder of the year 2018-2018. This is his second
grade year ….
Topics that may or may not be included, but not limited to:
Reading, writing, Geography, mathematics, arithmetic, history, science,
technology, music, art, health, phys. ed., religion
Resources/materials that may or may not be included, but not limited to:
Internet, reference books, library, computer games/apps,
calculating/measuring tools, arts and craft supplies, writing supplies, board
games, community resources, GECO
I am sure that in conjunction with his hours from second grade at Woodland
Academy that I will meet 990 hours of instruction as required by the public
school system.  I am of competent ability and good morals to homeschool my
child and I also have an Associates Degree. An annual progress report or
dated work sample will be submitted upon request.

I do not authorize Woodland Academy to disclose confidential or directory information to any third party organizations without my prior written consent. This includes but is not limited to the following directory information that Woodland Academy has designated as directory information, such as students name, address, telephone listing, date of birth, and major fields of study. Please commence authorization as expeditiously as possible and should there be any reason for disproval, please redirect me as to what needs to be fixed in this education plan as required by law. Thank you for your time and attention to this matter.

That same day, Goodall also signed, dated, and filed a letter of withdrawing A.S. from Woodland and stating that she was submitting a notice of intent to homeschool pursuant to Chapter 76, § 1. Goodall then began providing at-home instruction to A.S. of approximately thirty hours per week, in accordance with the terms of the instructional plan she had submitted to the Superintendent for approval.

On or around January 16, 2018, Goodall received a letter from Woodland stating that A.S. was being marked "absent" from school. On January 16, 2018, Goodall emailed Ms. Patricia Padilla, the Principal of Woodland ("Principal Padilla"). In her email, Goodall informed Principal Padilla that she had filed her instructional plan with the Superintendent's office and was awaiting approval. Goodall provided a courtesy copy of the instructional plan that had been sent to the Superintendent.

On January 23, 2018, Goodall contacted the Superintendent by email, asking for an update on the status of her instructional plan and whether it had been approved by the School Committee. In this message, Goodall informed the Superintendent that Woodland was marking A.S. "absent" as if he were still enrolled there. Goodall also asked the Superintendent to let her know if any part of her instructional plan needed to be revised and stated that she had attempted to contact the Superintendent to discuss the status of her instructional plan but was referred to a

different department. Goodall provided the Superintendent with her phone number. Goodall did

not receive any message in reply from the Superintendent.

Goodall continued to provide weekly at-home instruction to A.S.  On March 9, 2018,

Goodall again contacted the Superintendent by letter, asking for an update on the status of her

instructional plan and whether it had been approved by the School Committee. In her letter,

Goodall noted that her instructional plan had been submitted for approval sixty (60) days before,

but that she had not received any response. Goodall requested to meet with the Superintendent in

person to discuss the status of her instructional plan. Goodall did not receive a reply from the

Superintendent.

### *Worcester Public Schools reports Goodall to the Department of Children and Families.*

On March 20, 2018, Goodall returned to her home to find a business card on her

door. The business card listed the name and contact information of Coonan, a DCF Investigator.

On March 21, 2018, Goodall contacted Coonan by email, and requested that Coonan disclose the

allegations made against her. That same afternoon, Coonan replied to Goodall via email. Coonan

disclosed that a mandated reporter had alleged that A.S. was not attending school and had

accumulated 48 absences. Coonan asked if she could arrange a time to meet with Goodall and

A.S. the following day (March 22, 2018), or Wednesday of the following week (March 28,

2018). Neither Goodall nor Coonan communicated with each other until the following week.

On or around March 23, 2018, Goodall received written notice from the Juvenile

Court that Worcester Public Schools had filed an ADF complaint on March 21, 2018, alleging

that she had failed to send her child to school as of March 12, 2018.  On March 28, 2018, at

approximately 9:30 a.m., Coonan sent a follow-up e-mail to Goodall, asking if she would be

available to meet. On March 29, 2018, at approximately 10:30 a.m., Coonan sent an email

to Goodall asking to set-up a time to meet with her. When Goodall returned to her home on the afternoon of March 29, 2018, she found a certified letter from Coonan informing Goodall that Coonan was planning to return to Goodall's house the following week, on April 3, 2018, at 11:00 a.m. Coonan's letter further stated that "if we are unable to observe your child we will have to have a legal consultation." That evening, Goodall wrote an email to Coonan which informed Coonan that Goodall had submitted an educational plan to the Superintendent and withdrawn A.S. from Woodland in January 2018. Goodall informed Coonan that parents in Massachusetts are not required by law to continue to send their children to school after a homeschool instructional plan has been submitted for approval. Goodall also informed Coonan that the Superintendent had not provided any further information regarding the status of her instructional plan, had not asked her to correct any deficiencies in the instructional plan, and had not asked her to provide any additional information.

On the morning of March 30, 2018, Goodall and A.S. left their home to run some errands. When Goodall and A.S. returned to their home, they were told by Goodall's father, Brian Gernrich ("Gernrich"), that some uniformed officers had come by the house earlier that morning. Gernrich had told the officers that Goodall was homeschooling A.S. While the officers were speaking with Gernrich, one of the officers called Cardona, who was Coonan's DCF Supervisor. Gernrich told the officers that Goodall and A.S. were expected to return to the home within the hour. The officers then left Goodall's home.

After Goodall returned home, she placed a copy of her instructional plan, as well as her emails to the Superintendent, in a blue folder and left it outside her door for Coonan. At approximately 11:30 a.m. on March 30, 2018, Goodall heard loud banging coming from her doorway.  Goodall asked who was there and a male voice responded

 "Police." A female voice said that they were not going to enter the house, and that they just wanted to confirm that A.S. was living and breathing. Goodall told the police that A.S. was with her in the home and that she was uncomfortable bringing A.S. to the police because he had had a traumatic experience with officers several years before-- she was willing to take A.S. to his physician to verify his health. Goodall also told the police that she had been in contact with DCF and that she had put a folder outside the door which contained her homeschool paperwork. Goodall believes the officers saw the blue folder containing her homeschool paperwork when they arrived at her door and one of them looked inside the blue folder. Goodall told the police that she had submitted her homeschool paperwork to the Superintendent in accordance with Massachusetts law.

Goodall heard more loud bangs on her door. Goodall asked if the police were trying to open her door and told them that she did not consent to their entry. A female voice from the other side of the door said that she wanted Goodall to open the door. Goodall responded that she was not going to open the door because she was afraid it would upset A.S. Goodall told the officers that A.S. was with her inside the home. Goodall offered to take a picture of A.S. to verify that he was alright and to show it to the officers. A male voice from the other side of the door said that they were going to force open the door.  Goodall asked the officers if they could please provide their names.  A female voice said that her name was Officer Consiglio and that Goodall had three seconds. Officer Consiglio told Goodall that if she did not open the door, they would call a S.W.A.T. team to forcibly open the door. While the police were yelling at Goodall through the closed door, Goodall saw that A.S. was becoming visibly upset. Goodall believed that if she did not open the door, the police would forcibly open it and enter her home. Goodall believed that if the officers forced their way into her home, it would be traumatizing to A.S.  Because Goodall

did not want A.S. to endure any unnecessary trauma, she unlocked and opened the door to her home.

Upon opening the door, Goodall asked for the other officer's name. When Goodall opened the door, Officer Consiglio crossed the threshold and put her hands on Goodall. The police were in uniform and armed with service weapons. The officers had an outstanding bench warrant for Goodall that they discovered after they left her home that morning. The outstanding bench warrant was for a partially unpaid fine. Officer Consiglio instructed Goodall to put her hands behind her back. Goodall asked Officer Consiglio, "What are you doing?" Officer Consiglio handcuffed Goodall. Goodall asked Officer Consiglio, "What are the charges?" Officer Consiglio ordered Goodall in a loud, raised voice to sit down on a chair in the middle of her kitchen. Goodall sat on the chair as Officer Consiglio ordered her to do. Officer Consiglio then got close to Goodall and ordered her in a loud, raised voice to be quiet. Officer Consiglio told Goodall, again in a loud, raised voice, that they were there to check on the welfare of A.S., that Goodall was not cooperating with the police and that she had "zero tolerance" for Goodall. Goodall told Officer Consiglio that she had left a folder in front of her door containing her homeschool paperwork. Officer Consiglio told Goodall that DCF was with them and that Goodall was going to answer their questions. Goodall agreed.

Coonan placed a piece of paper on the kitchen table near Goodall. Coonan told Goodall that the letter contained the allegations that had been made against her. Coonan then suggested that Goodall contact the Superintendent because they had no record of Goodall's homeschool paperwork. Goodall told Coonan that she had left a folder at her door containing the homeschool paperwork she had sent to the Superintendent months before. Coonan told Goodall that the

14

police had seen the folder at Goodall's door and had taken it. Coonan repeated that the Superintendent had told her that they had no record of Goodall's homeschool paperwork. Coonan told Goodall that she had spoken with a woman named "Leslie" at the Superintendent's Office, and that Leslie had told Coonan that according to a new Massachusetts law, children had to continue attending public school until their homeschool plan was officially approved. Coonan told Goodall that this new law had "just started a few months ago," and that Goodall had broken it. Goodall told Coonan that she didn't understand this.

Coonan told Goodall that she needed to contact the Superintendent to discuss this law change with them, and to discuss why the Superintendent had no record of her homeschool paperwork. Coonan and the officers then moved toward A.S., who was in the apartment. A.S. was visibly upset as the officers and Coonan approached him. Coonan and the officers proceeded to question A.S. while Goodall remained handcuffed and seated on a chair in her kitchen. As Coonan and the officers continued to question A.S., five additional police officers arrived at Goodall's home and began to search through it. While Coonan continued to question A.S., the police arrested Goodall, removed her from the home, placed her in a squad car, and took her to the police station. At the police station, Goodall was booked and paid bail. She was released and picked up A.S from her brother's house. Goodall and A.S. returned to their home around 7:00 p.m. on March 30, 2018. No charges were filed against Goodall.

At no time prior to entering Goodall's home on March 30, 2018 did Coonan receive any allegations regarding any concerns about A.S.'s safety or the condition of Goodall's home. The only allegation she had received was that A.S. had accumulated absences from Woodland. On April 2, 2018, Coonan sent an email to Goodall stating that "it was very unfortunate what happened on Friday afternoon." In her email, Coonan also stated that "[DCF] does not have

concern for a child being home schooled but the law states the child needs to be enrolled in school or be officially approved by the local school department to be homeschooled."

On April 5, 2018, DCF concluded that the allegation of educational neglect against Goodall would be "supported" because Goodall was "not ensuring [A.S.'s] educational needs are being met as the child is not attending school and mother is not approved to homeschool. DCF also found the allegation of educational neglect "supported" because A.S. had "missed 48 days of school" and the Worcester Superintendent's Child Study Department "reported it is now the law that a child cannot be removed from school to be homeschooled until it is fully approved." In a letter dated April 5, 2018, DCF informed Goodall of its substantiated finding of educational neglect and advised her of her opportunity to appeal that determination.

On April 10, 2018, Goodall attended a hearing before the juvenile court on the ADF complaint filed by Worcester Public Schools which alleged that Goodall had failed to send A.S. to school.  At the hearing on April 10, 2018, the magistrate continued the matter to April 27, 2018. The magistrate instructed Worcester Public Schools and Goodall to consult on and approve a homeschool instructional plan by April 27, 2018. The magistrate instructed Worcester Public Schools and Goodall that if the homeschool instruction plan was not approved by April 27, 2018, the matter would be taken up again by the juvenile court. The magistrate did not order Goodall to send A.S. to Woodland while her instructional plan was being considered by Worcester Public Schools.

On April 10, 2018, Goodall submitted a revised instructional plan to the Superintendent which stated that she would be homeschooling A.S. for the remainder of the school year, and that she would provide instruction in reading, writing, geography, mathematics, arithmetic, history, science, technology, music, art, health, physical education, and religion, and that she would

provide dated work samples to the Superintendent's office upon request. On April 23, 2018, Goodall called the Superintendent and left a voicemail asking for an update on the status of her instructional plan. On April 24, 2018, Goodall emailed the Superintendent and asked for an update on the status of her instructional plan.

On April 24, 2018, the juvenile court dismissed the ADF complaint that had been filed against Goodall.  On April 25, 2018, Goodall received an email from Leslie Fuller ("Fuller") in the Superintendent's Office, advising Goodall that her instructional plan could now be approved because the ADF complaint before the juvenile court had been dismissed. On May 4, 2018, Goodall, through counsel, mailed a letter to the Superintendent, asking that the instructional plan be approved, or for a list of suggested revisions. On May 9, 2018, the Superintendent informed Goodall that her homeschool plan had been approved.

### *The Department's care and protection petition is dismissed.*

On May 1, 2018, Sarah Holland, an investigator employed by DCF ("Holland"), filed a care and protection petition against Goodall in the juvenile court, requesting that the court transfer custody of A.S. to the DCF.  Holland's supporting affidavit alleged that DCF learned on May 1, 2018 that "the home-schooling application was filed on April 10, 2018; however, the program [referring to the Superintendent's Office] is denying the child due to concerns with absences and pending legal charges from an ADF." Holland's statement in her affidavit was based on a statement made by Ms. Gloria McKibben, a school psychologist with the Worcester Public Schools, who told another DCF investigator on May 1, 2018, that the Superintendent would not approve Goodall's homeschool plan because the ADF complaint was still pending.  In fact, the ADF complaint had been dismissed on April 24, 2018. In addition, Fuller had

informed Goodall on April 25, 2018 that her instructional plan would now be approved because the complaint filed by Worcester Public Schools had been dismissed on April 24, 2018.

On May 8, 2018, the juvenile court set a hearing on the care and protection petition for November 6, 2018. In July 2018, the Juvenile Court appointed a special investigator to conduct an independent review of the DCF's petition against Goodall. The special investigator reviewed the DCF's records on Goodall and conducted independent interviews with Investigator Holland, Goodall, and A.S. On August 14, 2018, the special investigator submitted her findings to the juvenile court. The special investigator found that Goodall had filed all correct homeschool paperwork required under Massachusetts law. The special investigator further found that Goodall had provided the required paperwork numerous times to both the Superintendent and Woodland, that DCF did not review A.S.'s educational records prior to filing the petition, that DCF became involved in a dispute between the school and the parent, and that DCF's entry into Goodall's home on March 30, 2018 was unnecessary and traumatizing to the child. The special investigator concluded her report by recommending that the juvenile court dismiss the care and protection petition. On August 15, 2018, the juvenile court adopted the recommendations of the special investigator and dismissed the DCF's care and protection petition.

### *Goodall overturns the Department's supported finding of educational neglect.*

On May 4, 2018, Goodall, through counsel, timely filed a request for a fair hearing to challenge the DCF's decision on April 5, 2018 to "support" the allegation of educational neglect. Counsel also requested to review the DCF's records related to its decision to "support" the allegation of educational neglect.  On that same date, the DCF confirmed receipt of Goodall's request for a Fair Hearing and set a hearing date of June 14, 2018.

On June 5, 2018, the DCF provided Goodall with an electronic copy of its records related to its decision to "support" the allegation of educational neglect. Those records revealed that on March 15, 2018, a report was filed with the DCF alleging that Goodall was neglecting the education of A.S., who had accumulated 48 absences from Woodland. The reporter also alleged that Goodall had said she was homeschooling A.S., but that she had not started the homeschool process and that the school would be filing a complaint in the juvenile court the following day. The reporter was Doe, an unknown employee of Woodland. Doe reported Goodall to DCF because the School Committee's written attendance policy states that "[w]hen a student accumulates excessive unexcused absences, the principal (or his/ her designee) may seek assistance from the Juvenile Court and/or the Department of Children and Families to resolve attendance matters."

A.S. was not attending Woodland on March 15, 2018 and had not been attending Woodland since January 11, 2018 (January 11, 2018 was the date that Goodall notified the Superintendent and Woodland that she was withdrawing A.S. from public school—he had actually not been attending school for about a week prior to that date). The School Committee's written attendance policy required Woodland to notify Goodall in writing if A.S. accumulated more than five unexcused absences. Doe reported Goodall to DCF even though Goodall had not been provided written notice after A.S. allegedly accrued more than five unexcused absences. The School Committee's written attendance policy required Woodland to request a meeting with Goodall to discuss A.S.'s alleged absences from school. Doe reported Goodall to DCF even though Woodland had not previously contacted Goodall to request a meeting to discuss A.S.'s alleged absences from school. Nevertheless, on March 15, 2018, DCF described the allegations against Goodall as a report of "neglect" and designated a non-emergency response. DCF's

records further revealed that around 11:00 a.m. on March 28, 2018, Coonan attempted to contact

Woodland's School Adjustment Counselor regarding the report filed against Goodall. The

School Adjustment Counselor did not answer her phone, and Coonan did not leave a voicemail

message.

At approximately 11:00 a.m. on March 29, 2018, Coonan contacted the juvenile court

clerk and learned that Worcester Public Schools had filed a complaint against Goodall that was

scheduled for a hearing on April 10, 2018. At around 11:30 a.m. on March 29, 2018, Coonan

placed a call to the Superintendent's Office to ask about the process of homeschooling.

According to DCF's records, Coonan spoke with a woman

identified as "secretary Leslie," *i.e.*, Fuller. Fuller told Coonan that the Superintendent's Office

did not have a homeschool application for A.S. Fuller also told Coonan that Massachusetts had

recently passed a new homeschool statute which said that a child must continue to attend school

until their application to homeschool is fully accepted.

Around 1:00 p.m. on March 29, 2018, Coonan spoke by telephone with Jean Conway

("Conway") from the Superintendent's Office. Conway told Coonan that Goodall had never

made an inquiry or application for A.S. to be homeschooled. DCF's records further revealed that

at approximately 2:00 p.m. on March 29, 2018, Coonan spoke with Ms. Elaine Kline ("Kline"),

the School Adjustment Counselor at Woodland. Kline told Coonan that Principal Padilla had sent

emails to Goodall regarding her decision to homeschool and that Goodall had never replied.

According to Goodall, she never received a response to the message she sent to Principal Padilla

on January 16, 2018.

DCF's records also revealed that on March 30, 2018,  Coonan reviewed Goodall's email

from the night before, which informed Coonan that Goodall had sent her homeschool plan to the

Superintendent in January 2018 and had stated that parents are not required by law to send their

children to public school while a homeschool plan is being approved. Upon reviewing Goodall's

email, Cardona, contacted the Worcester Police Department and asked them to send officers to

Goodall's home to conduct a well-being check on A.S. The police dispatched two officers to

conduct a well-being check at Goodall's home. The officers proceeded to Goodall's home at

approximately 10:30 a.m. on March 30, 2018. Subsequent events are detailed above.

At Goodall's Fair Hearing on June 14, 2018, Coonan testified that Fuller did not advise

Coonan about the SJC's opinion in *Charles* when advising Coonan about the requirements to

homeschool. She also testified that the allegation of educational neglect was only supported

because A.S. was reported to have missed 48 days of school-- if A.S. had only missed a few days

of school, instead of 48 days, DCF would not have supported a finding of neglect.

Coonan admitted under that she did not ask to review any of A.S.'s education or attendance

records and she did not ask Kline or Fuller how many of A.S.'s alleged absences from school

accrued before A.S. was withdrawn from Woodland on January 11, 2018, and how many were

accrued after January 11, 2018.  She also admitted that she did not ask Goodall for any details

about her instruction of A.S. at home after January 11, 2018, and she did not ask to review any of

Goodall's homeschool or attendance records.  Goodall contends that she provided A.S. with

thirty hours of weekly instruction at home from January 11, 2018 through April 5, 2018.

In October 2018, DCF informed Goodall that the hearing officer had recommended that

the DCF's finding of educational neglect be reclassified as "unsupported." Goodall is currently

homeschooling A.S. and plans to continue homeschooling A.S. during the 2019-2020 school

year and subsequent school years. Goodall will be legally required to submit, and plans to

submit, an educational plan to the Superintendent at the start of the 2019-2020 school year and

subsequent school years.  Upon filing her educational plan with the Superintendent at the start of

the 2019-20120 school year and subsequent school years, Goodall's educational plan will be

subject to approval by the Superintendent or School Committee, in accordance with the School

Committee's Homeschool Policy. While Goodall's homeschool plan for the 2019-2020 school

year and subsequent school years is pending approval by the Superintendent or School

Committee, Goodall will be subject to the School Committee's Homeschooling and Attendance

Policies.

### Discussion

Plaintiffs' claims against all Defendants are, for the most part, based on their contention

that *Care & Protection of Charles*, 399 Mass. 324, 331, 504 N.E.2d 592 (1987) does not require

that a homeschool plan be preapproved before a child can be withdrawn from public school.

Indeed, according to Plaintiff, in *Charles*, the SJC *"explicitly"* states that a child may be

withdrawn from school once the parent(s) has notified the school district of her intent to

homeschool. Plaintiffs contend that the School Committee's policy to mark as "absent" a student

whose homeschool plan has been submitted but not approved violates *Charles* and/or is

unconstitutional**.**  Plaintiffs further challenge the legality of the Worcester School Defendants'

policy of filing a report of educational neglect with the DCF where a child has accumulated an

excessive amount of absences from school while his homeschool plan is being considered.

Plaintiffs contend that if the DCF receives a report of educational neglect as the result of such

excessive absences, it should refrain from undertaking an investigation.

Under *Charles*, local school districts have the discretion to determine the standards

applicable to homeschooling for children subject to their jurisdiction.  At the same time, "the

approval of a home school proposal must not be conditioned on requirements that are not

essential to the State interest in ensuring that "all of the children shall be educated'" *Charles*,

399 Mass. at 336, 504 N.E.2d at 600.  In summarizing the school district's obligations, the SJC

stated:

> We begin by reiterating our [prior] holding … that '[h]ome education of the child by [the parents] without the prior approval of the superintendent or the [school] committee [does] not show a compliance with the statute and bar the prosecution of the complaints.' Thus, as the statute indicates, approval must be obtained *in advance*, i.e., prior the removal of the children from the public school and to the commencement of the home schooling program.

*Charles*, 399 Mass. at 337, 504 N.E.2d 592 (emphasis in original).  The SJC outlines the type of

approval procedure which would be acceptable: (1) the parents must be given an opportunity to

explain their plan and present witnesses-- "the parents bear the responsibility of demonstrating

that the home school proposal meets the [statutory] requirements … in that the instruction will

equal 'in thoroughness and efficiency, and in the progress made therein, that in the public

schools in the same town…;" and (2) if the school committed and/or superintendent reject the

homeschool plan, they must provide detailed reasons why and the parents must then be given an

opportunity to file a revised plan." *Id.*, at 337-38, 504 N.E.2d 592.  The SJC went on to state that

"if the parents commence the education of their children at home *in the face of the school*

*committee's refusal to approve the parents' home school proposal,* the burden of proof … shifts

to the school committee to show" that the proposed homeschool plan fails to meet the standards

set for students attending public school in that district. *Id.* (emphasis added).

In accordance with this mandate, the School Committee has enacted the Homeschool

Policy which sets forth the requirements which must be met and the procedures to be followed

when parents elect to homeschool their children. Among the requirements is that the proposed

home educational program be accepted and approved in advance by the Worcester Public

Schools.  Until the homeschool plan is approved, the child must continue to attend public school;

if the child fails to do so, he will be marked absent, as A.S. was in this case.  If the student accumulates significant absences, the Superintendent and/or School Committee, as mandatory reporters, will notify DCF. DCF may then begin an investigation to determine whether the child has been subject to educational neglect.  Goodall contends that the aforementioned policy is violative of *Charles* and her claims flow from that contention.

Contrary to Goodall's interpretation, *Charles* contemplates that a child cannot be withdrawn from school until *after* the school committee and/or superintendent has had an opportunity to review a proposed homeschooling plan *and* either approved or rejected it —a student may not be withdrawn from school upon the initial filing of a plan.  *Accord In re Ivan*, 48 Mass.App.Ct. 87, 89 (1999)(court citing *Charles* stated that "prior approval of the superintendent or committee is a prerequisite to removal of children from school and to the commencement of a home schooling program.").  The reason for allowing the school district to review a proposed homeschooling plan as a prerequisite is obvious:  "For the State to set educational standards that home schooling parents must follow, but then give plenary enforcement power to the parents themselves, would establish a regime of 'voluntary compulsory education.' Universal education is too precious to our society to allow some parents to opt out, however high their motive." *Blount v. Dep't of Educ. & Cultural Servs.*, 551 A.2d 1377, 1382 (Me. 1988).  Put another way, the state's interest in ensuring that all children receive a quality education would be undermined if a parent could unilaterally withdraw a child from school immediately upon notification to the school district that the child was being homeschooled without there being any assurance that the child would be receiving an education that complied with minimal state requirements. This case is an example of why such a policy would be untenable.  Goodall informed the Superintendent via email that she would be withdrawing A.S. to homeschool him and provided an instruction

"plan." In her communication to the Superintendent, Goodall indicated A.S. "may *or may not*"
be instructed in specified topics constituting core curriculum classes, and that the sources utilized
to teach him "may *or may not*" include specified educational resources. In other words, Goodall
failed to identify what courses A.S. would be instructed in and failed to identify what resources,
*i.e.*, books, computer, etc. would be utilized in instructing him.  With this background in mind, I
will now analyze the Defendants' motions to dismiss.

### The DCF Defendants' Motion to Dismiss

The DCF Defendants seek dismissal of claims asserted against them in Count III (Section
1983 claim for interference of fundamental right of parent to direct education of their children
and to family integrity, family privacy and intimate association), and Count IV (Section 1983
claim against Cardona and Coonan for unreasonable search and seizure).  The DCF Defendants
also seek dismissal of Count Six wherein Plaintiffs seek a declaration and judgment that if the
DCR receives a report of educational neglect and discovers during its investigation that the
report was made because the parents and school officials disagree on whether a homeschool plan
should be approved the DCF should refer the matter back to the School Committee or
Superintendent for resolution under *Charles* instead of making a finding of educational neglect.[2]

The Section 1983 Claims against the DCF Defendants in Their Individual Capacities

To state a claim under Section 1983, a plaintiff must show that the challenged conduct
was committed by a person acting under color of state law and that the conduct worked a
deprivation of rights, privileges, or immunities secured by the Constitution or federal law.  42
U.S.C. §1983; *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir. 1997), *cert. denied*, 522 U.S. 819,
118 S.Ct. 71 (1997).  Section 1983 liability "may be imposed both for action that deprives a

---

[2] The Court will address the DCF Defendants' motion to dismiss Count VI of the Complaint, *infra,* in
conjunction with the Worcester School Defendants' motion to dismiss Count V.

plaintiff of a constitutional right and for failure to act, when there is a duty to act, to prevent such a deprivation." *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983).

Liability may be imposed against an individual as the result of his own action/inaction, or for failure to properly supervise a subordinate. However, in civil rights actions, supervisors are not vicariously liable for the misconduct of those under their command. The supervisor's action or inaction must be affirmatively linked to the subordinate's behavior "in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008)(citation to quoted case omitted). "The requirement of an 'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'" *Id.* (citation to quoted case omitted). There is no dispute that Cardona and Coonan were acting under color of state law at all relevant times and therefore, the Court will focus on whether Plaintiffs have alleged facts sufficient to state a plausible claim that their constitutional rights have been violated by these Defendants.

In Count III of the complaint, Plaintiffs assert claims against Coonan and Cardona for violation of Goodall's Fourteenth Amendment substantive due process right to care for, educate and raise her child. In Count IV of the Complaint, A.S. alleges that Coonan and Cardona violated his Fourth Amendment right to be free from unreasonable search and seizure. More specifically, Plaintiffs allege that on March 29, 2018, Goodall "told" Coonan that she had submitted a homeschool plan to the Superintendent and that neither the Superintendent nor the School Committee had asked her to provide any additional information or to correct any deficiencies. She also alleges that she "correctly" told Coonan that parents in Massachusetts are not required to continue to send their children to public school while approval of a homeschool

plan is pending and that she should review *Charles.*  Plaintiffs further allege that a reasonable

investigator in Coonan's position would have had doubts about the allegations raised against

Goodall. As to A.S.'s Fourth Amendment claim, Plaintiffs' argue that Coonan and Cardona set in

motion a series of events that they know or should have known would cause the Worcester

Police to unreasonably seize and interrogate A.S through the threat and use of physical force and

to unlawfully remove him from his home.

Coonan and Cardona, on the other hand, argue that although a parent's right to care for,

educate and raise their children is a recognized liberty interest protected under the Due Process

Clause, that right is not absolute-- it must be balanced against and, at times, give way to the best

interests of the child and/or the interest of society in cultivating young citizens.  Moreover,

given the government's compelling interest in the welfare of the child, there is no constitutional

right to be free from a child abuse investigation.  Coonan and Cardona further assert that based

on the facts alleged in the Complaint, DCF was statutorily required to investigate Goodall for

educational neglect of A.S. and Cardona and Coonan did so in accordance with the statutory

scheme.  Since Cardona and Coonan followed constitutionally adequate procedures, they argue

their conduct cannot be found to have violated the Fourteenth Amendment and Plaintiffs'

Substantive Due Process claim must be dismissed. They further argue that Count IV should be

dismissed for failure to state a claim first, because Goodall ultimately consented to the entry of

her home, second, because a warrantless search was justified under the "exigent circumstances"

exception to the warrant requirement as Cardona, Coonan and the police were attempting to

verify A.S.'s well-being after Goodall consistently refused an in-person meeting with Coonan,

and third, it was reasonable for Coonan and Cardona to have requested that the police assist DCF

in doing a well-being check—and it was the police that ultimately demanded entry into the house

and conducted the alleged illegal search. Finally, Coonan and Cardona assert that even if this

Court were to find that they violated the Plaintiffs' Fourteenth and/or Fourth Amendment rights,

they are entitled to qualified immunity.[3] Because the issues are intertwined, the Court will

consider whether the Plaintiffs have alleged plausible claims for violation of their constitutional

rights in the context of its qualified immunity analysis.

> ### *Whether Plaintiffs have stated a claim against Coonan and Cardona; Whether Coonan and Cardona are entitled to Qualified Immunity*

A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. This doctrine gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.  A familiar two-step inquiry determines whether the defendants are entitled to qualified immunity:

> First, we inquire whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation. Second, we inquire whether the violated right was clearly established at the time that the offending conduct occurred. The second, "clearly established," step itself encompasses two questions: whether the contours of the right, in general, were sufficiently clear, and whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right.

*Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014)(internal citations, and internal quotation marks

omitted). The court has the "discretion not to engage in the first inquiry, but to go directly to the

second." *Id*.

For an asserted right to be "clearly established," its "contours ... must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right." *Anderson v.*

---

[3] Although Cardona was a supervisor, it appears that Plaintiffs are asserting claims against her based on her own actions/inactions.  Arguably, Plaintiffs have failed to allege sufficient facts against Cardona to state a plausible claim in either Count III or Count IV. Nonetheless, I will assume that the Plaintiffs' factual allegations implicate Cardona to the same extent they do Coonan.

*Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*

*Count III—Substantive Due Process*

Plaintiffs repeatedly point to *Charles* as support for their contention that the law in effect at the time of the underlying events clearly established that a student could be withdrawn from school once a homeschool plan has been filed, and that reasonable officials in Coonan's and Cardona's position would have been aware of the same and not started an investigation.  As discussed above, however, I disagree with Plaintiffs' interpretation of *Charles*. Moreover, in this case, Plaintiffs cite Supreme Court and other precedent referring generally to the parental right to direct the upbringing and education of their children.  As to whether a school district may in compliance with the Fourteenth Amendment require prior approval of a homeschooling plan before a student can be withdrawn from public school, Plaintiffs focus solely on *Charles*. They have failed to cite any Supreme Court case or line of cases, or assuming that such authority would be persuasive, any First Circuit case(s) and/or a consensus of cases of the courts of appeals which would permit this Court to find that these Defendants, who were simply acting in accordance with statutory and regulatory requirements, violated a clearly established constitutional right. *See Taylor v. Barkes*, 135 S.Ct. 2042. 2045 (2015)(no decision of Supreme Court or consensus of cases among the courts of appeal established the constitutional right which plaintiff alleged (assuming holding of governing circuit court or consensus of cases by the circuit courts of appeal is persuasive authority to clearly establish a constitutional right)); *Andrews v. Hickman Cty., Tenn.,* 700 F.3d 845, 862 (6th Cir. 2012)(to find clearly established right, absent

extraordinary circumstances, district court looks to binding precedent by Supreme Court, its court of appeals or itself.)  Accordingly, I find as a matter of law that Coonan and Cardona are entitled to qualified immunity on Plaintiffs' substantive due process claim asserted in Count III.

*Count IV-- Fourth Amendment*

The Fourth Amendment requires government officials, including social workers, who go to a home to investigate reported child abuse or neglect allegations for the purpose of assuring the well-being of the child to obtain a warrant unless an exception to the warrant requirement applies. *See Hickman*, 700 F.3d at 861(noting that the Supreme Court has not explicitly held that the Fourth Amendment does not create a social worker exception to Fourth Amendment, but other circuit courts have held it does not).  Coonan and Cardona argue that the "exigent circumstances" exception applies because there existed a reasonable belief that A.S. was in danger based on the report that the Worcester Public Schools had filed with DCF, Goodall's admitted refusal to meet with Coonan in person and her refusal at the time to simply bring A.S. to the door so that the police and Coonan could verify he was okay. I will assume that under these circumstances, it was not reasonable to believe that A.S. was in immediate danger and/or that removal was necessary to prevent him from being harmed. Consequently, I will go directly to the second prong of the qualified immunity analysis.

In this case, it had been reported to DCF that A.S. had been absent from school for 48 days. I will assume that Coonan and Cardona knew that Goodall had informed the Worcester School Defendants and Woodland that she was withdrawing A.S. from Woodland and would thereafter be homeschooling him.  They also knew that a Homeschool plan had not been approved for A.S., that the Worcester public schools considered him truant, and that they had a

copy of the Homeschool plan which Goodall had submitted to the Superintendent[4]. At the same time, Coonan made multiple attempts to contact Goodall so she could interview her and assess A.S. However, based on Goodall's own version of the facts asserted in the Complaint, Goodall did not agree to a face to face meeting, rather she only communicated with Coonan via email. Under the governing statute and regulations, reasonable care workers in Coonan and Cardona's position would not have believed that they were violating any clearly established law by initiating a child abuse and/or neglect investigation and contacting the police to assist in a well-being check of A.S. Accordingly, they are entitled to qualified immunity on A.S.'s claim asserted in Count IV that they violated his Fourth Amendment rights by setting in motion the events which led the police to come to Plaintiffs' home enter the home, search it and ultimately remove A.S. after arresting Goodall.[5]

## The Worcester School Defendants' Motion to Dismiss

Plaintiffs allege in Count I that the Worcester School Committee, by adopting a policy that prohibits a parent who has applied to homeschool her child from withdrawing that child from public school until the application has been approved, has violated a parent's Fourteenth Amendment right under the Due Process clause to direct the education of her child. Plaintiffs seek monetary damages and a declaration under Chapter 231A that the decision of parent who has submitted an application to home school her child to immediately withdraw her child from school pending approval of the application is lawful and such parent should not be subject to any penalty as the result of her actions.

---

[4] I will also note that as discussed above, that Goodall's homeschool plan was patently deficient on its face.

[5] To the extent that A.S. seeks to hold Coonan and Cardona liable for the actual entry into the home and his removal, I find Coonan and Cardona entitled to qualified immunity.  Once at the home with a police escort, reasonable case workers in Coonan's  and Cardona's positions would have relied on the expertise of the police in determining whether entry was necessary and how to conduct such entry. Moreover, it was the police officers' decision to arrest Goodall on an outstanding bench warrant which necessitated the removal of A.S., a young child, from the then unattended home. *See* discussion in *Hickman*, 700 F.3d at 861.

<u>The Plaintiffs' Due Process Claim Against the Worcester School Defendants-- Count I</u>

Plaintiffs allege that the Homeschool Policy and the Attendance Policy enacted by the

School Committee and carried out by the Worcester School Defendants violates Goodall's

fundamental right to direct the education of her child, A.S.  While I agree that Goodall has a

fundamental right to direct A.S.'s education, that right is not absolute—it is limited in scope and

is subject to reasonable government regulation. *See Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct.

2588 (1976)(court has repeatedly stressed that while parents have constitutional right to send

children to private school offering specialized instruction, they have no right to provide children

with private school education unfettered by reasonable government regulation.) [6] The Worcester

School Committee has enacted a policy whereby a student must continue to attend public school

pending approval of a homeschool application or be marked absent. The Court has already stated

why such a policy is reasonable: the state's interest in ensuring that all children receive a quality

education would be undermined if a parent could unilaterally withdraw a child from school

immediately upon notification to the school district that the child was being homeschooled

without there being any assurance that the child would be receiving an education that complied

with minimal state requirements[7].  Moreover, the Attendance Policy simply underscores that a

---

[6] "[P]arental control over child-rearing and education has been conceptualized as an aspect of the right to privacy secured by the ninth amendment and the due process clause of the fourteenth amendment. The Constitution recognizes a privacy interest which attaches to certain decisions concerning intimate personal relationships, and governmental interference with that interest must be justified by an appropriate governmental interest, and must be no greater than is reasonably necessary to serve that interest." *Blackwelder v. Safnauer*, 689 F. Supp. 106, 136 (N.D.N.Y. 1988)(internal citations omitted)(court found it was unclear whether compelling interest or reasonableness test applies to privacy claim, but found that New York compulsory education statute passed muster under either standard). The Plaintiffs, who are alleging violation of Due Process, argue that the Worcester School Defendants must show that the Homeschool Policy is "necessary" to accomplish the government's interest. I find that the standard is "reasonably necessary" but, in any event, it is clear that Plaintiffs are not arguing that the School Committee must establish a compelling interest.

[7] The one aspect of *Charles* that I do find that Plaintiffs get right is that if the school district rejects a plan, the parents may then withdraw their children from school and commence homeschooling while working with the district to finalize an acceptable plan.  The Homeschool and Attendance Policies do not make it clear that a student

child must continue to attend public school while the homeschool application process is pending. To hold to the contrary would render the prior approval prerequisite meaningless as parents would have no incentive to provide a comprehensive instructional plan in the first instance.

I further find that School Committee has reasonably tailored these policies so that they are not greater than reasonably necessary to serve the government's interest. Accordingly, I find that these policies pass constitutional muster.  Therefore, Plaintiffs have failed to state plausible claims against the Worcester School Defendants in Count I.

<u>The Motions To Dismiss Counts V and VI</u>

In Count II, Plaintiffs have alleged a Section 1983 claim against Doe, an unknown employee of Woodland. That is the only claim that remains pending other than Plaintiffs' claims for declaratory judgment under Chapter 231A.  If all federal claims are dismissed, it is my intention not to exercise jurisdiction over the Chapter 231A claims. Accordingly, I am denying the Worcester School Defendants' motion to dismiss Count V and the Commissioner's motion to dismiss Count VI, without prejudice. The parties should confer and determine how they wish to proceed regarding Count II and inform the Court within thirty (30) days.

**<u>Conclusion</u>**

It is hereby Ordered that:

(1) the Commonwealth's Motion To Dismiss Counts 3,4 and 6 From the Complaint (Docket No. 8) is ***<u>granted</u>***;

(2) Defendant Worcester School Committee and Superintendent Maureen Binienda's Motion To Dismiss the First and Fifth Causes of Action From Plaintiff's [sic] Complaint (Docket No. 10) is ***<u>granted</u>***; and

---

will not be marked absent under such circumstances. However, that case is not before me and therefore, I need not address whether the Homeschool Policy violates that aspect of *Charles*.

(3) Plaintiffs' Motion To Strike Defendant Worcester School Committee's Motion To Dismiss and Supporting Exhibits (Docket No. 15) is **denied**.

A status conference will be held in this case on November 20, 2019 at 2:15 p.m.

/s/ *Timothy S. Hillman*
TIMOTHY S. HILLMAN
DISTRICT JUDGE